**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
HAYLEY REYNOLDS (State Bar No. 306427)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELENA NACARINO and MEGAN TAY-LOR, as individuals, on behalf of themselves, the general public and those similarly situated,<br><br>    Plaintiffs,<br><br><br>        v.<br><br>KASHI COMPANY,<br><br>    Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; UNJUST ENRICHMENT; AND VIOLATIONS OF ILLINOIS CONSUMER PROTECTION STATUTES**<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      Plaintiffs Elena Nacarino and Megan Taylor by and through their counsel, bring this class action against Defendant Kashi Company to seek redress for its deceptive practices in labeling and marketing its consumer food products.

2.      Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein. To capitalize on this trend, Defendant prominently labels some of its consumer food products as providing specific amounts of protein per serving depending on the product, such as "11g Protein" on the front of its Kashi Go Cinnamon Crisp cereal. Consumers, in turn, reasonably expect that each product will provide the actual amount of protein per serving claimed on the front of the product package.

3.      In truth, however, Defendant's products do not deliver the amount of protein that the labels claim. For example, Defendant labeled the front of the box of its Kashi Go Cinnamon Crisp cereal as providing "11g Protein." Based on amino acid content testing, Defendant's products contain less protein than claimed, meaning, for example, rather than containing 11 grams of protein, the Kashi Go Cinnamon Crisp cereal actually contained only 9.37 grams (i.e., an overstatement by approximately 18%) in a 51-gram serving.

4.      Further, Defendant uses proteins of low biological value to humans, such as oat protein, in its products. Accordingly, when the protein content is adjusted for its poor quality based on the Food and Drug Administration ("FDA") mandated "Protein Digestibility Corrected Amino Acid" score, ("PDCAAS"), Defendant's products provide even less protein per serving than amino acid content testing alone reveals. Oat protein typically has a PDCAAS score between 0.45 and 0.51. Thus, after adjusting the protein content based on PDCAAS, the Kashi Go Cinnamon Crisp cereal provides only 7 grams of protein (i.e., an overstatement by approximately 57%).

5.      Defendant's misrepresentations caused Plaintiffs and members of the class to pay a price premium for the products.

**PARTIES**

6.      Elena Nacarino is an individual and a resident of San Francisco, California.

7.      Megan Taylor is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Grayslake, Illinois.

8.      Elena Nacarino and Megan Taylor are collectively referred to hereafter as "Plaintiffs."

9.      Defendant Kashi Company ("Defendant") is a corporation existing under the laws of California with its principal place of business in Solana Beach, California, and is registered to do business in California.

**JURISDICTION AND VENUE**

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one Plaintiff and Defendant are citizens of different states.

11.      The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

13.      In accordance with California Civil Code Section 1780(d), Plaintiff Nacarino concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased Kashi Go cereals in the Original, Honey Almond Flax Crunch, Peanut Butter Crunch, and Cinnamon Crisp flavors at stores in the Bay Area, including Target in Daly City, California. (Plaintiff Nacrino's declaration is attached hereto as Exhibit A.)

14.      Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**SUBSTANTIVE ALLEGATIONS**

15.     Defendant manufactures, distributes, markets, advertises, and sells a variety of breakfast and snack products in the United States under the brand name "Kashi." Some of these products, including cereals, bars, waffles, and bowls, have packaging that predominately, uniformly, and consistently states on the principal display panel of the product labels that they contain and provide a certain amount of protein per serving. Plaintiffs have attached as Exhibit B a non-exhaustive list of the Kashi products that make protein claims on the front of the product packages. The products listed in Exhibit B, and any other Kashi brand product that claims a specific amount of protein on the front of its label, will hereinafter be referred to as the "Products."

16.     The representation that the Products contain and provide a specific amount of protein per serving was uniformly communicated to Plaintiffs and every other person who purchased any of the Products in California, Illinois and the United States. The same or substantially similar product label has appeared on each Product during the entirety of the Class Period in the general form of the following example:



Class Action Complaint

17.    As described in detail below, Defendant's advertising and labeling of the Products as containing and providing specific amounts of protein per serving is false, misleading, and intended to induce consumers to purchase the Products at a premium price, while ultimately failing to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that a serving of the Products will provide the grams of protein as represented on the label, when in fact, protein content testing for the Kashi Go Cinnamon Crisp cereal, for example, revealed that a serving contains only 9.37 grams of protein – an overstatement by approximately 18%. Further, when correcting for the digestibility (and therefore bio-usability) of the protein through PDCAAS, the amount provided will be even less because Defendant uses proteins of low biological value to humans in its products, such as oats. For example, after adjusting the protein content based on PDCAAS, the Kashi Go Cinnamon Crisp cereal provides only 7 grams of protein (i.e., an overstatement by approximately 57%).

**Consumer Demand for Protein**

18.    Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. This is especially true in the community of athletes, registered dietitians, and coaches, to which Defendant markets. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[1]

19.    Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure,

---

[1] FDA Protein Fact Sheet,
https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf

reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[2] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that means about 70 grams of protein each day.

20.    Athletes and fitness enthusiasts typically consume much higher amounts of protein each day; typically between 1 to 1.5 grams of protein for every pound of body weight.

21.    The health benefits of protein are just as important, if not more important, for children. Children are in a relative state of constant growth and rely on protein as the building block of muscle, bone, skin, hair, and virtually every other body part or tissue. The National Academies of Science recommends the following amounts of daily intake of protein based on age group: 1-3 years old: 13 g of protein per day; 4-8 years old: 19 g of protein per day; 9-13 years old: 34 g of protein per day.[3]

22.    Protein *quantity* by itself does not tell the full story from a human nutritional standpoint. A protein's *quality* is also critical because, as explained below, humans cannot fully digest or utilize some proteins. As the FDA has stated in published guidance: "Information on protein quantity alone can be misleading on foods that are of low protein quality" as a result, "nutrition labeling must allow consumers to readily identify foods with particularly low quality protein to prevent them from being misled by information on only the amount of protein present." 58 Fed. Reg. 2079 at 2101-2.

23.    Protein is not a monolithic substance, but instead comes in many varieties. Proteins are chains of different amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the protein that is ingested changes the function of the protein in the body, and certain types of proteins are more easily digested and used by humans than others.

---

[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients)*.
[3] *Id.*

24.     All of a human body's proteins are formed through the process of protein synthesis. That is, although humans consume dietary proteins, human bodies digest those proteins, break them down into their constituent amino acids, and then use those amino acids to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are called the "essential amino acids" and they must be supplied through the diet.

25.     All nine essential amino acids are necessary for protein synthesis to take place. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

26.     A protein source's digestibility also affects the amount of useable protein a person receives from consuming it. Many plant-based proteins are only 85% digestible, meaning 15% of the protein from that source will simply pass through the body without ever being absorbed at all.

27.     As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS") is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii). The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then multiply that number by humans' ability to digest the amino acid profile.

28.     Defendant uses plant-based proteins in its products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important.

Whey protein is animal-based and contains all nine essential amino acids. It has a high biological value and is fully digestible by humans. Thus, whey protein has a PDCAAS of 1.0. Plant protein contains higher levels of antioxidants, but rarely contains all nine essential amino acids. Further, plant proteins such as oat proteins, which Defendant uses in its Products according to their ingredient lists, are not fully digested by humans. Oat proteins typically have a PDCAAS of between 0.45 and 0.51, meaning only 45-51% of the protein from those sources will be digested and bioavailable to humans.

29.     Accordingly, Defendant's use of low quality proteins, even in combination with some higher quality proteins, means that they actually provide far less protein to humans than the Product labels claim, or that amino acid content testing without correcting for digestibility shows.

**Federal and State Regulations Governing Food Labeling**

30.     The Food and Drug Administration regulates nutrition content labeling. According to these regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . shall be given if a protein claim is made for the product . . ." 21 C.F.R. 101.9(c)(7)(i).

31.     Further, FDA regulations require the DRV to be calculated using amino acid analysis, more specifically the Protein Digestibility Corrected Amino Acid Score ("PDCAAS"). 21 C.F.R. § 101.9(c)(7)(ii); FDA Food Labeling Guide, p. 29, Question N.22. The PDCAAS method does not calculate protein content by nitrogen combustion, which is otherwise permitted under 21 C.F.R. § 101.9(c)(7) for products that do not make protein content claims.[4]

32.     Accordingly, when a product makes a protein content claim, FDA regulations require manufacturers to calculate the amount of amino acids that the food contains and then multiply that amount by humans' ability to digest the amino acid profile (the PDCAAS) to come up with a percent daily value.

33.     Identical federal, California and Illinois laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The Illinois legislature adopted federal regulations as well in the Illinois Food, Drug, and Cosmetic Act. 410 ILCS 620. The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

34.     Under the FDCA, the term false has its usual meaning of "untruthful," while the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

35.     To implement the FDCA, the Food and Drug Administration (FDA) promulgated regulations, including regulations that govern nutrient content claims. A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement, outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1); 21 C.F.R. § 101.13(c). Stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c). Like labels generally, nutrient content claims in particular cannot be "false or misleading in any respect." 21 C.F.R. 101.13(i)(3).

36.     In addition to regulating nutrient content claims, FDA regulations require labels to include a Nutrition Facts Panel ("NFP"), 21 C.F.R. § 101.9, and that the NFP contain a statement of the number of grams of protein in a serving. 21 C.F.R. § 101.9(c)(7). The regulations permit a

manufacturer to compute the number of grams of protein for the NFP by relying on the nitrogen method of analysis as given in the "Official Methods of Analysis of the AOAC International." *Id.* Manufacturers are also permitted to rely on alternative methods. *Id*.

37.     Moreover, where a product makes a protein claim, it must include a percent daily value for the protein in the NFP using PDCAAS, a method that accounts for both the quantity and quality of protein in the product. 21 C.F.R. 101.9(c)(7)(i)-(ii). The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by PDCAAS, and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with a percent daily value. *Id.*

38.     While a required statement *inside* of the NFP escapes regulations reserved for nutrient content claims (21 C.F.R. § 101.13(c)), the identical statement *outside* of the NFP is still considered a nutrient content claim and is therefore subject to 21 C.F.R. § 101.13(i)(3). 21 C.F.R. § 101.13(c). Indeed, the Ninth Circuit has specifically held that "a requirement to state certain facts in the nutrition label is not a license to make that statement elsewhere on the product." *Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015). Thus, Defendant's protein representations on the front label are subject to analysis as a nutrient content claim and cannot be false or misleading in any manner.

39.     Defendant's protein representations on the front package are false and misleading because they broadly tout protein quantity while ignoring that the poor quality proteins in the Product and the fact that the Products will provide far less useable protein than claimed. Indeed, the FDA stated in published guidance that such a practice is misleading. *See* 58 Fed. Reg. 2079 at 2101-2 ("Information on protein quantity alone can be misleading on foods that are of low protein quality.")

40.     Further in addition to its blanket adoption of federal labeling requirements, California and Illinois have also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if label is false and misleading); California Health & Safety Code § 110705

(misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous); 410 ILCS 620/11.

41.     Representing that the Products contain a certain amount of protein per serving, as Defendant's labels do, is a statement of fact, and use of these phrases on the labels of packaged food is limited by the aforementioned laws and regulations.

**Defendant's Marketing and Labeling of its Products Violates State and Federal Food Labeling Laws**

42.     Defendant's labeling of the Products is unlawful and violates the Sherman Law, California Health & Safety Code § 110660, et seq., because the Products' labels state that each Product contains and provides a specific amount of protein per serving—such as "11g Protein" for the Kashi Go Cinnamon Crisp cereal—when, in fact, amino acid content testing reveals that the Products contain less – such as 9.37 grams of protein for the Kashi Go Cinnamon Crisp cereal, which overstates the protein by approximately 18%. Further, Defendant uses proteins of low biological value to humans in its products, such as oat protein. For example, after adjusting the protein content based on PDCAAS, the Kashi Go Cinnamon Crisp cereal provides only 7 grams of protein (i.e., an overstatement by approximately 57%).

43.     Defendant's marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

a.  Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

b.  Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

c.  Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

44.     A reasonable consumer would expect that the Products contain and provide what Defendant identifies them to contain and provide on the product labels and that the labels would not be contrary to the policies or regulations of the State of California, the State of Illinois, and/or the FDA. For example, a reasonable consumer would expect that when Defendant labels its Products as containing "11g Protein" per serving, as it claimed on the 51 gram serving size of the Kashi Go Cinnamon Crisp cereal's label, the Products would provide 11 grams of protein per 51 gram serving. However, based on amino acid content testing, Defendant's Products contain less protein than claimed. For example, the Kashi Go Cinnamon Crisp cereal only contained 9.37 grams of protein per 51 gram serving size – an overstatement of approximately 18%.

45.     Moreover, based on the types of protein stated in the Products' ingredient lists, the amount of digestible or usable protein the Products actually deliver to the human body is even lower than the amino content testing itself reveals. Defendant uses poor quality proteins, such as oat proteins, in the Products, which will result in each Product's overall PDCAAS being far less than 1.0. For example, after adjusting the protein content based on PDCAAS, the Kashi Go Cinnamon Crisp cereal provides only 7 grams of protein (i.e., an overstatement by approximately 57%).

46.     Consumers lack the meaningful ability to test or independently ascertain the truth-fulness of Defendant's food labeling claims, especially at the point of sale. Consumers would not know the true protein content of the Products merely by looking elsewhere on the product package. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of a Product does not contain the number of grams of protein that is represented on the front of the product package. An average consumer also lacks the specialized knowledge necessary to determine the PDCAAS for the Products. That combined with Defendant's active concealment in representing that the Products contain and provide specific amounts of protein per serving, and not disclosing otherwise any-where on the label, gave the average reasonable consumer no reason to suspect that Defendant's representations on the packages were false. Therefore, consumers had no reason to investigate

whether the Products actually do contain and provide the amount of protein per serving that the labels claim they do. Thus, reasonable consumers relied on Defendant's representations regarding the nature of the Products.

47.     Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with the claims on the Products that they contain and provide specific amounts of protein per serving.

**Defendant Misleadingly Markets Its Products to Increase Profits and Gain a Competitive Edge**

48.     In making false, misleading, and deceptive representations, Defendant distinguishes its Products from its competitors' products. Defendant knew and intended that consumers would purchase, and pay a premium for, products labeled as having more protein over comparable products that do not contain misleading protein representations on the product labels. By using this branding and marketing strategy, Defendant is stating that its Products are superior to, better than, and more nutritious and healthful than other products that do not misrepresent the number of grams of protein on their labels.

**Defendant Intends to Continue to Market its Products as Containing More Protein than the Products Actually Contain**

49.     Because consumers pay a price premium for products that contain more protein, by labeling its Products as containing more grams of protein per serving than they actually contain, Defendant is able to both increase its sales and retain more profits.

50.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of its Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in its products, and/or (ii) commanding a higher price for its Products because consumers will pay more for these Products due to consumers' demand for products containing more protein.

51.     The market for protein products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the number of grams of protein in food

products, Defendant has an incentive to continue to make such false representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

52. For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[5]

53. To capitalize on the growing market, Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. Moreover, Defendant has continued to replicate its misrepresentations on the new product lines. It is therefore likely that Defendant will continue to misleadingly advertise its Products and perpetuate the misrepresentations regarding the protein in its Products.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Elena Nacarino**

54. Plaintiff Nacarino has purchased Kashi Go cereals in the Original, Honey Almond Flax Crunch, Peanut Butter Crunch, and Cinnamon Crisp flavors at stores in the Bay Area, including Target in Daly City, California, on multiple occasions during the last four years.

55. Plaintiff Nacarino made each of her purchases after reading and relying on the truthfulness of Defendant's product label that promised the Products provided the number of grams on the label. For example, she purchased the Kashi Go Cinnamon Crisp cereal relying on the representation of "11g Protein" per serving on the front of the product package. She relied on the protein representation for each product that she purchased and purchased each product because of the protein representations. But on each of the Products she purchased, Defendant misrepresented the protein contents of the Products as containing more protein than they actually provide. For example, the Kashi Go Cinnamon Crisp contains 18% less protein than claimed, and provides even less when adjusted by the PDCAAS.

56. At the time of each of her purchases of the Products, Plaintiff Nacarino did not know that the Products did not contain or provide the amount of protein represented on the label.

---

[5] https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright

As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to Plaintiff Nacarino.

57.     Plaintiff Nacarino not only purchased the Products because the labels said that they contained a specified amount of protein per serving, but she also paid more money for the Products than she would have paid for other or a similar product that was not mislabeled regarding the number of grams of protein it contained.

58.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Nacarino would not have purchased them or, at a very minimum, she would have paid less for the Products.

59.     Plaintiff Nacarino continues to desire to purchase protein products, including those marketed and sold by Defendant. If the Products were reformulated to provide the grams of protein that are represented on the labels, Plaintiff Nacarino would likely purchase them again in the future. Plaintiff Nacarino regularly visits stores where the Products and other protein products are sold. Because Plaintiff Nacarino does not know the formula for Defendant's products and cannot test whether or not the Products provide the amount of protein that is represented on the label, Plaintiff Nacarino will be unable to rely on Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from labeling its products with the incorrect number of grams of protein that each serving contains. Should Defendant begin to market and sell a new line of products, Plaintiff Nacarino could be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation.

60.     Plaintiff Nacarino and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under state law and the products are misbranded; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

**Plaintiff Megan Taylor**

61.     Plaintiff Taylor has purchased Kashi chewy granola bars in the Dark Mocha Almond, Chocolate Almond Sea Salt, Cherry Dark Chocolate, Honey Almond Flax, Trail Mix,

Chocolate Peanut Butter, and Grain Free Peanut Butter Chocolate flavors; Kashi cereals in the Whole Wheat Biscuit Cinnamon Harvest, Warm Cinnamon Organic Oat, Honey Toasted Oat, Kashi Go Dark Cocoa, and Kashi Go Cinnamon Vanilla, Kashi Go Cinnamon Crisp flavors; and Kashi waffles in the Blueberry, 7 Grain, Kashi Go Wild Blueberry, Kashi Go Cinnamon Brown Sugar, and Kashi Go Vanilla Buttermilk flavors, throughout grocery stores in the Round Lake Beach, Mundelein, Grayslake, McHenry, Wauconda, Libertyville, and Gurnee, IL area during the last four years.

62.     Plaintiff Taylor made each of her purchases after reading and relying on the truthfulness of Defendant's product label that promised the Products provided the number of grams on the label. For example, she purchased the Kashi Go Cinnamon Crisp cereal relying on the representation of "11g Protein" per serving. She relied on the protein representation for each product that she purchased and purchased each product because of the protein representations. But on each of the Products she purchased, Defendant misrepresented the protein contents of the Products as containing 18% more grams of protein than they actually contain, and as far more than they actually provide, when adjusted by the PDCAAS.

63.     At the time of each of her purchases of the Products, Plaintiff Taylor did not know that the Products did not contain or provide the amount of protein represented on the label. As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to her.

64.     Plaintiff Taylor not only purchased the Products because the labels said that they contained for example, "11g Protein" per serving, but she also paid more money for the Products than she would have paid for other or a similar protein product that was not mislabeled regarding the number of grams of protein it contained.

65.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Taylor would not have purchased them or, at a very minimum, she would have paid less for the Products.

66.     Plaintiff Taylor continues to desire to purchase protein products, including those marketed and sold by Defendant. If the Products were reformulated to provide the grams of

Class Action Complaint

protein that are represented on the labels, Plaintiff Taylor would likely purchase them again in the future. Plaintiff Taylor regularly visits stores where Defendant's Products and other protein products are sold. Because Plaintiff Taylor does not know the formula for Defendant's products and cannot test whether or not the Products provide the amount of protein that is represented on the label, Plaintiff Taylor will be unable to rely on Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from labeling its products with the incorrect number of grams of protein that each serving contains. Should Defendant begin to market and sell a new line of products, Plaintiff Taylor could be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation.

67.     Plaintiff Taylor and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under Illinois law and the products are misbranded; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

## **CLASS ALLEGATIONS**

68.     Plaintiffs bring this class action lawsuit on behalf of themselves and proposed classes of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> The Class: All persons in the United States who purchased the Products between September 10, 2017 and the present.

> The California Sub-Class: All persons in the State of California who purchased the Products between September 10, 2017 and the present.

> The Illinois Sub-Class: All persons in the State of Illinois who purchased the Products between September 10, 2017 and the present.

69.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

70.     Numerosity: Plaintiff does not know the exact size the Classes, but they estimate

that it is composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

71. Common Questions Predominate: This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Classes are:

    a.  What is the true nature of the protein content in the Products;

    b.  Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful because of misrepresentations;

    c.  Whether Defendant's actions violate Federal, California, and Illinois laws invoked herein;

    d.  Whether labeling the Products as containing more grams of protein than they actually contain causes the Products to command a price premium in the market as compared with similar products that do not make such misrepresentations;

    e.  Whether Defendant's advertising and marketing regarding the Products sold to the Class members was likely to deceive reasonable consumers;

    f.  Whether representations regarding the number of grams of protein in the Products are material to a reasonable consumer;

    g.  Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

    h.  The amount of profits and revenues earned by Defendant as a result of the conduct;

    i.  Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j.    Whether Class members are entitled to payment of actual, incidental,

consequential, exemplary and/or statutory damages plus interest thereon, and if so,

what is the nature of such relief.

72.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the

Class because, among other things, all such claims arise out of the same wrongful course of

conduct engaged in by Defendant in violation of law as complained of herein. Further, the

damages of each member of the Class were caused directly by Defendant's wrongful conduct in

violation of the law as alleged herein.

73.    Adequacy of Representation: Plaintiffs will fairly and adequately protect the

interests of all class members because it is in their best interests to prosecute the claims alleged

herein to obtain full compensation due to them for the unfair and illegal conduct of which they

complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests

of class members. Plaintiffs have retained highly competent and experienced class action

attorneys to represent their interests and that of the class. By prevailing on their own claims,

Plaintiffs will establish Defendant's liability to all class members. Plaintiffs and their counsel

have the necessary financial resources to adequately and vigorously litigate this class action, and

Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are

determined to diligently discharge those duties by vigorously seeking the maximum possible

recovery for class members.

74.    Superiority: There is no plain, speedy, or adequate remedy other than by

maintenance of this class action. The prosecution of individual remedies by members of the

classes will tend to establish inconsistent standards of conduct for Defendant and result in the

impairment of Class members' rights and the disposition of their interests through actions to

which they were not parties. Class action treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of effort and expense that numerous individual actions

would engender. Furthermore, as the damages suffered by each individual member of the classes

may be relatively small, the expenses and burden of individual litigation would make it difficult

or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

75.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

**PLAINTIFFS' FIRST CAUSE OF ACTION**
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code §
1750, *et seq.*)**
**On Behalf of Plaintiff Nacarino and the California Sub-Class**

76.     Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

77.     Plaintiff Nacarino brings this claim individually and on behalf of the other members of the California Sub-Class.

78.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

79.     Plaintiff and other sub-class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

80.     The Products that Plaintiff (and other similarly situated sub-class members) purchased from Defendant were "goods" within the meaning of California Civil Code § 1761(a).

81.     Defendant's acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that the Products contained and provided the amount of protein claimed on the product package. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continue to violate, § 1770(a)(2), §

1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendant has disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Defendant has advertised goods or services with intent not to sell them as advertised. Finally, regarding California Civil Code §1770(a)(8), Defendant falsely or deceptively markets and advertises that, unlike other protein product manufacturers, it sells Products that contain more grams of protein than the Products actually contain.

82.    Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Sub-Class will continue to suffer harm. Plaintiff and those similarly situated have no adequate remedy at law to stop Defendant's continuing practices.

83.    Defendant was provided with notice and a demand to correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiff seeks, pursuant to California Civil Code § 1780(a)(3), on behalf of herself and those similarly situated sub-class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

84.     Plaintiff also request that this Court award her costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## PLAINTIFFS' SECOND CAUSE OF ACTION
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiff Nacarino and the California Sub-Class**

85.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

86.     Plaintiff Nacarino brings this claim individually and on behalf of the other members of the California Sub-Class.

87.     Beginning at an exact date unknown to Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

88.     Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing contained more grams of protein per serving than the Products actually contained or provided.

89.     Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing Defendant's Products or paying less for them.

90.     Defendant's acts and omissions are likely to deceive the general public.

91.     Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

92.     The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

93.     As a direct and proximate result of such actions, Plaintiff and the other Sub-Class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

94.     Plaintiff seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Plaintiff and those similarly situated lack any adequate remedy at law to obtain this restitution.

95.     Plaintiff seeks, on behalf of herself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

96.     Plaintiff seeks, on behalf of herself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFFS' THIRD CAUSE OF ACTION**
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Plaintiffs and the Class**

97.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

98.     Plaintiffs bring this claim individually and on behalf of the other members of the Class.

99.     Defendant has fraudulently and deceptively informed that the Products contain more grams of protein than they actually contain or provide.

100.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant knew or should have known the composition of the Products, and knew or should have known that the Products did not contain or provide the amount of protein represented on the label. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendant's Products. In misleading Plaintiffs and not so informing Plaintiffs, Defendant breached its duty to them. Defendant also gained financially from, and as a result of, its breach.

101.    Plaintiffs and those similarly situated relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

102.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

103.    Plaintiffs and those similarly situated justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant.

104.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

105.    Defendant's conduct as described herein was wilful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

**PLAINTIFFS' FOURTH CAUSE OF ACTION**
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Plaintiff Nacarino and the California Sub-Class**

106.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

107.    Plaintiff Nacarino brings this claim individually and on behalf of the other members of the California Sub-Class.

108.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

109.    In particular, Defendant has engaged, and continue to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations cited above.

110.    In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following misrepresenting that the Products contain and provide more grams of protein than they actually contain or provide.

111.    Plaintiff and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

112.    Defendant's acts and omissions are likely to deceive the general public.

113.    Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

114.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

115.    As a direct and proximate result of such actions, Plaintiff and the other Sub-Class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and Sub-Class members lost the amount they paid for the Products.

116.    As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

117.    Plaintiff seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon. Plaintiff and those similarly situated lack any adequate remedy at law to obtain this restitution.

118.    Plaintiff seeks, on behalf of herself and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

119.    Plaintiff seeks, on behalf of herself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover

monies paid to Defendant to which they were not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PLAINTIFFS' FIFTH CAUSE OF ACTION
**(Unjust Enrichment)**
**On Behalf of Plaintiffs and the Class**

120.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein

121.    Plaintiffs bring this claim individually and on behalf of the other members of the Class.

122.    Plaintiffs and members of the Class conferred a benefit on the Defendant by purchasing the Products

123.    Defendant has been unjustly enriched in retaining the revenues from Plaintiffs' and Class members' purchases of the Products, which retention is unjust and inequitable, because Defendant falsely represented that the Products contained and provided specific amounts of protein per serving, when, in fact, the Products contained less protein than represented, and provided even less. This harmed Plaintiff and Class members because they paid a price premium as a result.

124.    Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this restitution.

125.    Plaintiffs, therefore, seek an order requiring Defendant to make restitution to them and other members of the Class.

### PLAINTIFFS' SIXTH CAUSE OF ACTION
**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**On Behalf of Plaintiff Taylor and the Illinois Sub-Class**

126.    Plaintiffs incorporate the above paragraphs by reference as though fully set forth herein.

127.    Plaintiff Taylor brings this action individually and on behalf of the Illinois Sub-Class.

128.    The Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pre-tense, false promise, misrepresentation or the concealment, suppression or omission of any mate-rial fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

129.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, qual-ity, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) en-gages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

130.    Defendant engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendant as set forth above concerning the protein content of the Prod-ucts, which has caused damage and injury to Plaintiff and the Sub-Class members. Plaintiff and Sub-Class members were injured by Defendant's unfair and deceptive conduct at the time of pur-chasing the Products.

131.    Defendant represented, directly or indirectly, that its Products provide a certain amount of protein, when in reality, they provide far less usable protein as alleged herein.

132.    Defendant knew or should have known that its protein representations were false and misleading.

133.    Defendant's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

134.     Defendant's deceptive acts proximately caused actual injury and damage to Plaintiff and the Sub-Class members at the point of purchase.

135.     Plaintiff and Sub-Class members would not have purchased, or would have paid less for, the Products but for Defendants' material misrepresentations as described in this Complaint. Defendant intended Plaintiff and all Sub-Class members to rely on their deceptive acts when purchasing Defendants' Products.

136.     Plaintiff seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon. Plaintiff and those similarly situated lack any adequate remedy at law to obtain this restitution.

137.     Plaintiff seeks, on behalf of herself and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

138.     Plaintiff seeks, on behalf of herself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of Illinois, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the Illinois Uniform Deceptive Trade Practices Act alleged to have been violated herein.

### PLAINTIFFS' SEVENTH CAUSE OF ACTION
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
On Behalf of Plaintiff Taylor and the Illinois Sub-Class**

139.     Plaintiffs incorporate the above paragraphs by reference as though fully set forth herein.

140.    Plaintiff Taylor brings this action individually and on behalf of the Illinois Sub-Class.

141.    In Illinois, the Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pre-tense, false promise, misrepresentation or the concealment, suppression or omission of any mate-rial fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform De-ceptive Trade Practices Act.'"

142.    Plaintiff and the Sub-Class members were injured by Defendant's deceptive mis-representations and these misrepresentations were material and deceived Plaintiff and the Sub-Class. Because Plaintiff and Sub-Class members relied on Defendant's misrepresentations, con-cealments and omissions when purchasing Defendant's Products, they were injured at the time of purchase.

143.    Defendant does business in Illinois, sells and distributes the Products in Illinois, and engaged in and continue to engage in deceptive acts and practices in connections with the sale of its Products in Illinois and elsewhere in the United States.

144.    The Products purchased by Plaintiff and the Sub-Class members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

145.    Defendant engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendant as set forth above concerning its Products, which has caused damage and injury to Plaintiff and Sub-Class members at the time of purchase.

146.    Defendant represented, directly or indirectly, that its Products provide a certain amount of protein, when in reality, they provide far less usable protein as alleged herein.

147.    Defendant knew or should have known that its protein representations were false and misleading.

148.     Defendant's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

149.     Defendant's deceptive acts proximately caused actual injury and damage to Plaintiff and the Sub-Class members at the point of purchase.

150.     Plaintiff and Sub-Class members would not have purchased, or would have paid less for, the Products but for Defendants' material misrepresentations as described in this Complaint. Defendant intended Plaintiff and all Sub-Class members to rely on their deceptive acts when purchasing Defendants' Products.

151.     Plaintiff seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon. Plaintiff and those similarly situated lack any adequate remedy at law to obtain this restitution.

152.     Plaintiff seeks, on behalf of herself and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

153.     Plaintiff seeks, on behalf of herself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of Illinois, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the Illinois Consumer Fraud and Deceptive Business Practices Act alleged to have been violated herein.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated,

respectfully request that the Court enter judgement against Defendant as follows:

A.    Certification of the proposed Classes, including appointment of Plaintiffs' counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.    An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.    An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

F.    An award of treble damages, except for those causes of action where treble damages are not legally available;

G.    An award of restitution in an amount to be determined at trial;

H.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

I.    For reasonable attorneys' fees and the costs of suit incurred; and

J.    For such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  September 10, 2021        **GUTRIDE SAFIER LLP**

Seth A. Safier, Esq.
Marie McCrary, Esq.
Hayley Reynolds, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

-31-

<u>**EXHIBIT A**</u>

I, Elena Nacarino, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.      As set forth in my complaint, I purchased Kashi Go cereals in the Original, Honey Almond Flax Crunch, Peanut Butter Crunch, Cinnamon Crisp flavors at retail stores in the Bay Area, including Target in Daly City, California, on multiple occasions during the last four years.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 31st day of August 2021, in San Francisco, California.



Elena Nacarino

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

**Exhibit B**

| Product Type | Variety/Flavor | Protein Nutrient Content Claim |
|---|---|---|
| **Kashi Cereal** | | |
| Kashi GO Cereal | Toasted Berry Crisp | 9g |
| Kashi GO Cereal | Chocolate Crunch | 10g |
| Kashi GO Cereal | Peanut Butter Crunch | 10g |
| Kashi GO Cereal | Cinnamon Crisp | 14g |
| Kashi GO Cereal | Honey Almond Flax Crunch | 9g |
| Kashi GO Cereal | Original | 12g |
| Kashi GO Cereal | Crunch | 10g |
| Kashi GO Cereal | Dark Cocoa | 12g |
| Kashi GO Cereal | Cinnamon Vanilla | 12g |
| Kashi Cereal | Simply Raisin Whole Wheat Biscuit | 7g |
| Kashi Cereal | Simply Whole Wheat Biscuits, Cinnamon Harvest | 7g |
| Kashi Cereal | Simply Whole Wheat Biscuits, Island Vanilla | 7g |
| Kashi Cereal | Simply Whole Wheat Biscuits, Berry Fruitful | 7g |
| Kashi Cereal | Warm Cinnamon Organic Oat Cereal | 4g |
| Kashi Cereal | Organic Blueberry Clusters | 5g |
| Kashi Cereal | Honey Toasted Organic Oat Cereal | 4g |
| Kashi Cereal | Autumn Wheat Organic Whole Wheat Biscuits | 7g |

| Product Type | Variety/Flavor | Protein Nutrient Content Claim |
|---|---|---|
| Kashi Cereal | Organic Strawberry Fields | 5g |
| Kashi Kids | Kids Berry Super Loops | 4g |
| Kashi Kids | Kids Chocolate Super Loops | 4g |
| Kashi Kids | Cinnamon Super Loops | 4g |
| **Kashi Waffles** | | |
| Kashi GO Protein Waffles | Wild Blueberry | 13g |
| Kashi GO Protein Waffles | Cinnamon Brown Sugar | 13g |
| Kashi GO Protein Waffles | Vanilla Buttermilk | 13g |
| Kashi Gluten Free Waffles | Original | 3g |
| Kashi Gluten Free Waffles | Cinnamon | 3g |
| Kashi Waffles | Blueberry | 3g |
| Kashi Waffles | 7 Grain | 3g |
| **Kashi Bars** | | |
| Kashi Soft Baked Breakfast Bars | Mixed Berry | 2g |
| Kashi Soft Baked Breakfast Bars | Ripe Strawberry | 2g |
| Kashi Soft Baked Breakfast Bars | Chocolate | 2g |
| Kashi Chewy Granola Bar | Dark Mocha Almond | 3g |
| Kashi Chewy Granola Bar | Chocolate Almond Sea Salt | 3g |
| Kashi Chewy Granola Bar | Chocolate Chip Chia | 3g |
| Kashi Layered Granola Bar | Dark Chocolate Coconut | 3g |
| Kashi Chewy Granola Bar | Honey Almond Flax | 3g |
| Kashi Chewy Granola Bar | Cherry Dark Chocolate | 2g |
| Kashi Chewy Granola Bar | Trail Mix | 3g |
| Kashi Chewy Granola Bar | Chocolate Peanut Butter | 3g |

| Product Type | Variety/Flavor | Protein Nutrient Content Claim |
|---|---|---|
|  |  |  |
| Kashi Grain Free Granola Bars | Coconut Almond | 5g |
| Kashi Grain Free Granola Bars | Peanut Butter Chocolate | 6g |
| **Kashi Plant Powered Bowl** | | |
| Kashi Plant Powered Bowl | Cashew Noodle | 15g |
| Kashi Plant Powered Bowl | Mayan Harvest | 10g |
| Kashi Plant Powered Bowl | Sweet Potato Quinoa | 9g |
| Kashi Plant Powered Bowl | Chimichurri Quinoa | 10g |