**JENNER & BLOCK LLP**
Dean N. Panos (*pro hac vice*)
dpanos@jenner.com
353 North Clark Street
Chicago, IL 60654
Phone:          (312) 222-9350
Facsimile:      (312) 527-0484

**JENNER & BLOCK LLP**
Alexander M. Smith (Cal. Bar No. 295187)
asmith@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA  90071
Phone:          (213) 239-5100
Facsimile:      (213) 239-5199

Attorneys for Defendant
Kashi Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELENA NACARINO and MEGAN TAYLOR, as individuals, on behalf of themselves, the general public and those similarly situated, | Case No. 3:21-cv-7036-VC |
| | The Honorable Vince Chhabria |
| Plaintiffs, | |
| v. | **NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS & AUTHORITIES** |
| KASHI COMPANY, | |
| Defendant. | Hearing Date:      December 16, 2021 |
| | Hearing Time:     10:00 a.m. |
| | Courtroom:         Remote (Zoom) |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on December 16, 2021 at 10:00 a.m., or as soon thereafter as the Court is available, Defendant Kashi Company will appear before the Honorable Vince Chhabria via the Zoom videoconference platform and will, and hereby does, move to dismiss the complaint filed by Plaintiffs Elena Nacarino and Megan Taylor pursuant to Federal Rule of Civil Procedure 12(b)(6), and each claim asserted therein, because it is preempted by federal law and therefore fails to state a plausible claim on which relief can be granted.

Kashi's motion to dismiss is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, its concurrently-filed Request for Judicial Notice and exhibits thereto, any additional briefing on this subject (including Kashi's reply brief), and the evidence and arguments that will be presented to the Court at the hearing on this matter.


DATED:  November 3, 2021                    JENNER & BLOCK LLP

By:  _____/s/  Dean N. Panos_____
                                                    Dean N. Panos

Attorneys for Defendant
Kashi Company

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................................... ii

INTRODUCTION ................................................................................................................................... 1

BACKGROUND .................................................................................................................................... 2

I.        The FDA's Protein Labeling Regulations ........................................................................... 2

II.       Plaintiffs' Lawsuit Against Kashi. ...................................................................................... 5

ARGUMENT ......................................................................................................................................... 6

I.        The FDA Regulations Foreclose Plaintiffs' "Protein Quantity" Theory. ........................... 7

II.       Plaintiffs' "Protein Quality" Theory Is Also Preempted. .................................................... 8

          A.       The FDA Does Not Require Kashi to Correct Purely Quantitative Protein Claims. ........... 8

          B.       The FDA Has Rejected Plaintiffs' Interpretation of 21 C.F.R. § 101.9(c)(7). .................. 12

CONCLUSION ..................................................................................................................................... 15

3048631.6

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Attias v. Crandall*,
968 F.3d 931 (9th Cir. 2020) ...................................................................11

*Bassiri v. Xerox Corp.*,
463 F.3d 927 (9th Cir. 2006) ...................................................................13

*Boise Cascade Corp. v. EPA*,
942 F.2d 1427 (9th Cir. 1991) .................................................................11

*Chacanaca v. Quaker Oats Co.*,
752 F. Supp. 2d 1111 (N.D. Cal. 2010) ..................................................10

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ................................................................................14

*Clark v. Time Warner Cable, Inc.*,
523 F.3d 1110 (9th Cir. 2008) .................................................................15

*Coe v. Gen. Mills, Inc.*,
No. 15-5112, 2016 WL 4208287 (N.D. Cal. Aug. 10, 2016) ..................10

*Colella v. Atkins Nutritionals, Inc.*,
348 F. Supp. 3d 120 (E.D.N.Y. 2018) .....................................................14

*Durnford v. MusclePharm Corp.*,
907 F.3d 595 (9th Cir. 2018) ...............................................................7, 10

*Federal Express Corp. v. Holowecki*,
552 U.S. 389 (2008) ................................................................................15

*Gitson v. Trader Joe's Co.*,
No. 13-1333, 2015 WL 9121232 (N.D. Cal. Dec. 1, 2015) ......................6

*Haggag v. Welch Foods, Inc.*,
No. 13-341, 2014 WL 1246299 (C.D. Cal. Mar. 24, 2014) .....................15

*Hood v. Wholesoy & Co.*,
No. 12-5550, 2013 WL 3553979 (N.D. Cal. July 12, 2013) ...................14

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ........................................................................13, 14

*Mee v. I A Nutrition, Inc.*,
No. 14-5006, 2015 WL 2251303 (N.D. Cal. May 13, 2015) .....................8

*Minor v. Baker Mills, Inc.*,
  No. 20-2901, 2020 WL 11564643 (N.D. Cal. Nov. 12, 2020) ..........................................12

*Pardini v. Unilever U.S., Inc.*,
  961 F. Supp. 2d 1048 (N.D. Cal. 2013) ..............................................................................6

*In re Pepsico, Inc., Bottled Water Mktg. & Sales Practices Litig.*,
  588 F. Supp. 2d 527 (S.D.N.Y. 2008)..................................................................................6

*Perea v. Walgreen Co.*,
  939 F. Supp. 2d 1026 (C.D. Cal. 2013) .............................................................................14

*Reid v. Johnson & Johnson*,
  780 F.3d 952 (9th Cir. 2015) ...............................................................................................7

*Romero v. Flowers Bakeries, LLC*,
  No. 14-5189, 2015 WL 2125004 (N.D. Cal. May 6, 2015) ...............................................14

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ...........................................................................................................14

*Turek v. Gen. Mills, Inc.*,
  662 F.3d 423 (7th Cir. 2011) ...............................................................................................6

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ...........................................................................................................14

**Statutes**

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ...............................................................................5

Cal. Bus. & Prof. Code §§ 17500 *et seq.* ...............................................................................5

Cal. Civ. Code §§ 1750 *et seq.*...............................................................................................5

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 101 *et seq.* ..........................2, 6, 7, 14

Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 *et seq.*................................6

**Other Authorities**

21 C.F.R. § 100.1(c)(4) .............................................................................................................6

21 C.F.R. § 101.9 ........................................................................................................... *passim*

21 C.F.R. § 101.13 ......................................................................................................... *passim*

58 Fed. Reg. 2079 (Jan. 6, 1993) .....................................................................................8, 9, 10

58 Fed. Reg. 44020 (Aug. 18, 1993)......................................................................................11

62 Fed. Reg. 67775 (Dec. 30, 1997) .............................................................................11

81 Fed. Reg. 33742 (May 27, 2016) ..........................................................................3, 4, 9

FDA, *Guidance for Industry: Letter Regarding Point of Purchase Food Labeling* (Oct. 2009) .......................................................................................................................11

Food, Drug, & Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*................................................ *passim*

1

### INTRODUCTION

2       This putative class action challenges Kashi's representations about the amount of protein present

3  in its products.  Notably, Plaintiffs do not dispute that Kashi calculates the number of grams of protein in

4  each product—which it states both in the Nutrition Facts panel and on the front of each package—using

5  the FDA-approved nitrogen method.  *See* 21 C.F.R. § 101.9(c)(7) ("Protein content may be calculated on

6  the basis of the factor 6.25 times the nitrogen content of the food.").  Nor do Plaintiffs dispute that Kashi

7  complies with the FDA's requirement to state the percent of daily value of protein, which it calculates

8  using the protein digestibility corrected amino acid score ("PDCAAS"), in the Nutrition Facts panel.

9       Despite Kashi's strict adherence to FDA regulations for protein labeling, Plaintiffs nonetheless

10  allege that Kashi exaggerates the quantity and quality of the protein present in its products.  Plaintiffs'

11  claims are preempted by federal law, as they seek to hold Kashi liable under state law for labeling practices

12  expressly permitted by the FDA.  Indeed, when faced with inquiries from Kashi and other manufacturers

13  targeted in copycat protein-labeling lawsuits filed by Plaintiffs' counsel, the FDA has repeatedly stated

14  that its regulations do not impose the labeling requirements Plaintiffs seek to mandate.  Plaintiffs' contrary

15  interpretation of the regulations is both textually unsupported and inconsistent with common sense.

16       Plaintiffs allege that Kashi's protein claims are misleading because "amino acid content testing"

17  reveals that the products contain less protein than advertised—both on the front label and in the Nutrition

18  Facts panel.  But the FDA does not require manufacturers to calculate protein content using "amino acid

19  content testing."  Instead, the FDA regulations provide that "[p]rotein content may be calculated on the

20  basis of the factor 6.25 times the nitrogen content of the food."  21 C.F.R. § 101.9(c)(7); *see also id.*

21  §101.9(c)(7)(ii) (referring to this number as the "actual amount of protein"). Plaintiffs do not—and

22  cannot—dispute that Kashi's representations about the number of grams of protein in its products are based

23  on the nitrogen method expressly permitted by the FDA.  Plaintiffs accordingly cannot invoke state law to

24  hold Kashi liable for mislabeling based on a methodology (*i.e.*, "amino acid content testing") that the FDA

25  does not require Kashi to use when calculating the number of grams of protein in its products.

26       Plaintiffs also allege that, even if Kashi is entitled to use the nitrogen method to calculate the

27  number of grams of protein in the Nutrition Facts panel, its front-label protein claims are misleading

28  because they exaggerate the quality and digestibility of the protein.  The central premise of this theory is

that the FDA regulations require Kashi to account for protein quality and digestibility by multiplying the "actual amount of protein" by the protein digestibility corrected amino acid score ("PDCAAS") any time it makes a "protein claim" outside the Nutrition Facts panel. Thus, under Plaintiffs' theory, Kashi would have to calculate the total protein content of its products using two different methodologies, which would render two different quantitative measurements on the same label—one for the Nutrition Facts panel (calculated using the nitrogen method) and one on the front of the package (adjusted using the PDCAAS).

The FDA regulations do not require this counterintuitive result. While the FDA mandates the use of the PDCAAS to calculate the "corrected amount of protein" if the manufacturer makes a "protein claim," it does not require manufacturers to correct the *number of grams* of protein. *See* 21 C.F.R. § 101.9(c)(7)(i). Instead, it requires that the "corrected amount of protein" be "expressed as a *Percent of Daily Value*" in the Nutrition Facts panel. *Id.* (emphasis added). Plaintiffs do not—and cannot—dispute that Kashi states the "corrected amount of protein" in the Nutrition Facts panel and expresses that amount as a percentage of daily value. The FDA regulations require no more of Kashi.

Plaintiffs' reading of the regulations, under which Kashi must correct for protein quality and digestibility *any time* it makes a protein claim outside the Nutrition Facts panel, is wrong. It ignores the FDA's deliberate decision to require manufacturers to express the "corrected amount of protein" as a percent of daily value. It is also impossible to reconcile with 21 C.F.R. § 101.13(o), which requires nutrient content claims (such as "13g Protein") to be based on the same "analytical methodology" used in the Nutrition Facts panel. It would result in consumer confusion by requiring manufacturers to place different protein measurements on the front of the box and in the Nutrition Facts. And it is contrary to the FDA's interpretation of its own regulations, which is entitled to substantial (if not controlling) weight.

Plaintiffs' lawsuit is preempted by federal law, and this Court should dismiss their complaint.

## **BACKGROUND**

### I.   **The FDA's Protein Labeling Regulations.**

The Federal Food, Drug, and Cosmetic Act ("FDCA") requires manufacturers of packaged food products to state the "total protein contained in each serving" on the label. 21 U.S.C. § 343(q)(1)(D). The FDA has promulgated a regulation, 21 C.F.R. § 101.9(c)(7), which provides more specific requirements about how manufacturers must calculate the amount of protein and state this information on the labeling.

21 C.F.R. § 101.9(c)(7) requires that protein content must be "calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the 'Official Methods of Analysis of the AOAC International,' except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, that specific factor shall be used." 21 C.F.R. § 101.9(c)(7). This regulation "require[s]" protein content to be measured according to the nitrogen method. 81 Fed. Reg. 33742, 33868 (May 27, 2016); *see also id.* at 33869 ("For purposes of nutrition labeling . . . protein is estimated by determining the nitrogen content of an ingredient and multiplying it by a nitrogen-to-protein conversion factor."). Notably, the FDA refers to the grams of protein calculated using the nitrogen method as the "actual amount of protein." 21 C.F.R. § 101.9(c)(7)(ii).

The FDA regulations also permit manufacturers to make quantitative claims about protein content *outside* the Nutrition Facts panel. In particular, "the label or labeling of a product may contain a statement about the amount or percentage of a nutrient," such as protein, so long as the "statement does not in any way implicitly characterize the level of the nutrient in the food and it is not false or misleading in any respect (*e.g.*, '100 calories' or '5 grams of fat') . . . ." 21 C.F.R. § 101.13(i)(3). If a manufacturer chooses to make a nutrient content claim, the accuracy of that claim is "determined using the analytical methodology prescribed for determining compliance with nutrition labeling in § 101.9." *Id.* § 101.13(o).

In accordance with 21 C.F.R. § 101.13, Kashi states the number of grams of protein on the front of each package, which is identical to the number of grams of protein in the Nutrition Facts panel:



RJN Ex. 1 (highlighting added).  Because Kashi's labeling includes a "protein claim," the FDA regulations require it to place a "statement of the corrected amount of protein per serving" on the labeling.  21 C.F.R. § 101.9(c)(7)(i).  This amount is calculated by multiplying the "actual amount of protein" (*i.e.*, the number of grams calculated using the nitrogen method) by the PDCAAS.  *Id.* § 101.9(c)(7)(ii).  Despite Plaintiffs' suggestion to the contrary, the PDCAAS does not provide a *quantitative* measure of the amount of protein in a given product; instead, it is an "amino acid scoring procedure that takes into account digestibility of a protein" and "provides a reasonable measure of protein *quality*."  81 Fed. Reg. 33869 (emphasis added).  To that end, the FDA does not require that the "corrected amount of protein per serving" be expressed as a number of grams of protein.  Instead, it expressly requires that the "corrected amount of protein per serving" be "calculated as a percentage of the RDI [recommended daily intake] or DRV [daily reference value] for protein . . . and expressed *as Percent of Daily Value*."  21 C.F.R. 101.9(c)(7)(i) (emphasis added).

In short, the FDA regulations require that the number of grams of protein be calculated using the nitrogen method and placed in the Nutrition Facts panel, and they permit manufacturers to place this information elsewhere on the label as well.  To the extent the FDA regulations require manufacturers to account for protein digestibility at all, the adjusted amount of protein must be "expressed as a Percent of Daily Value"—not in grams.  21 C.F.R. § 101.9(c)(7)(i).

To confirm that the FDA interpreted its regulations as Kashi did, one of Kashi's attorneys, Ricardo Carvajal, contacted the FDA's Center for Food Science and Applied Nutrition ("CFSAN"), which invites interested parties to submit questions relating to the application of the FDA regulations through the FDA's "Technical Assistance Network."  *See* RJN Ex. 2–3 (relevant portions of CFSAN website).  Using the FDA's online portal, Mr. Carvajal asked the FDA whether it believed that "a quantitative statement of protein [must] be based on the actual amount of protein as determined by the nitrogen method," or whether it believed "that any quantitative statement of protein made outside the NF [Nutrition Facts] must be based on the corrected amount of protein as determined by PDCAAS[.]"  RJN Ex. 4; *see also* Carvajal Decl. ¶ 2. The FDA responded: "Our regulations do not require that the gram amount of protein declared in a quantitative statement made outside the Nutrition Facts Panel be corrected for protein digestibility."  *Id.* (emphasis added); *see also* Carvajal Decl. ¶ 3.  The FDA has taken the same position in response to inquiries from other manufacturers.  *See, e.g.*, RJN Ex. 5 (inquiry from counsel for KIND LLC).

## II. **Plaintiffs' Lawsuit Against Kashi.**

Kashi scrupulously complies with the FDA's protein labeling regulations. In addition to stating the "actual amount of protein" (which Kashi calculates using the FDA-required nitrogen method) in the Nutrition Facts panel and on the front of the box, Kashi also states the "corrected amount of protein" in the Nutrition Facts panel and expresses it as a percent of daily value. For example, while Kashi Cinnamon Crisp cereal contains 13 grams of protein per serving out of FDA's recommended daily intake of 50 grams per day (or 26%), it provides only 21% of the daily value of protein after correcting for protein quality using the PDCAAS. To that end, Kashi includes both the "actual amount of protein" calculated using the nitrogen method (13 grams) and the "corrected amount of protein" (21% of daily value) in the Nutrition Facts panel, just as the FDA requires. *See* RJN Ex. 1. Plaintiffs nonetheless allege that Kashi's FDA-compliant protein claims are misleading and unlawful. Their lawsuit is premised on two distinct theories:

First, Plaintiffs allege that Kashi's products are mislabeled because they "do not deliver the amount of protein that the labels claim." Compl. ¶ 3. Relying on supposed "amino acid content testing," Plaintiffs allege that Kashi's products "contain less protein than claimed." *Id.* Notably, Plaintiffs do not claim that they tested the nitrogen content of Kashi's products or that Kashi's products contain less protein than claimed based on nitrogen content testing. Nor do Plaintiffs elaborate on the methodology used to conduct their purported "amino acid content testing." And while Plaintiffs suggest that all of the challenged Kashi products are mislabeled, they reference only a single test, which purported to show that Kashi Cinnamon Crisp cereal contained only 9.37 of the 11 grams of protein claimed on the label. *See id.* ¶¶ 3, 17.

Second, Plaintiffs allege that Kashi uses "low quality proteins" in its products, which allegedly "provide far less protein to humans than the Product labels claim." Compl. ¶ 29; *see also id.* ¶ 4 (alleging that Kashi "uses proteins of low biological value to humans, such as oat protein, in its products"). Based on that allegation, Plaintiffs assert that Kashi's "protein representations on the front package are false and misleading because they broadly tout protein quantity while ignoring that the poor quality proteins in the Product . . . will provide far less useable protein than claimed." *Id.* ¶ 39.

Based on these allegations, Plaintiffs assert claims for: (1) violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*; (2) violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (3) common-law fraud; (4) violations of the Unfair Competition Law, Cal.

5

Bus. & Prof. Code §§ 17200 *et seq.*; (5) unjust enrichment; (6) violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 *et seq.*; and (7) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.  See* Compl. ¶¶ 76–153.

### ARGUMENT

The premise of Plaintiffs' lawsuit is that Kashi misleads consumers by exaggerating both the quantity and quality of protein present in its products.  But Plaintiffs' theories of mislabeling are both preempted, as they seek to impose labeling requirements on Kashi (*i.e.*, to calculate protein content using a method other than nitrogen combustion and to state the "corrected amount of protein" in grams, rather than as a percent of daily value) that differ from those imposed by the FDA.

The Nutrition Labeling & Education Act ("NLEA") includes a broad express preemption provision, which provides that "no State . . . may directly or indirectly establish . . . any requirement for . . . labeling of food . . . that is *not identical to* the requirement[s]" imposed by federal law.  21 U.S.C. § 343-1(a) (emphasis added); *see also Pardini v. Unilever U.S., Inc.*, 961 F. Supp. 2d 1048, 1053 (N.D. Cal. 2013) (characterizing this as a "broad preemption provision").  As the FDA has explained, "'[n]ot identical to' does not refer to the specific words in the requirement but instead means that the State requirement directly or indirectly imposes obligations or contains provisions" that are "not imposed by or contained in" or that "[d]iffer from those specifically imposed by or contained in" the federal Food, Drug & Cosmetic Act or the FDA's implementing regulations.  21 C.F.R. § 100.1(c)(4).  In other words, states cannot impose their own unique labeling standards that go "beyond, or [are] different from" the federal labeling standards that the FDA has established*.  In re Pepsico, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 588 F. Supp. 2d 527, 532 (S.D.N.Y. 2008); *see also Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011) ("Even if the disclaimers that the plaintiff wants added would be consistent with the requirements imposed by the Food, Drug, and Cosmetic Act, consistency is not the test [for NLEA preemption]; identity is.").

As a result, "[i]f a food label does not violate the federal statute, any state law claim arising from that label is automatically preempted, because when it comes to food labels, state law may only impose liability for what the federal statute proscribes."  *Gitson v. Trader Joe's Co.*, No. 13-1333, 2015 WL 9121232, at *1 (N.D. Cal. Dec. 1, 2015) (Chhabria, J.).  In assessing whether UCL, FAL, and CLRA claims are preempted, "[t]he preemption analysis turns on whether the challenged statements are authorized by

the FDA's regulations or other pronouncements of similar legal effect." *Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015). If Kashi's protein representations—and its methodology for calculating protein content—comply with the applicable FDA regulations, any claims seeking to hold Kashi liable for making those representations on its labeling are necessarily preempted.

## I. The FDA Regulations Foreclose Plaintiffs' "Protein Quantity" Theory.

Plaintiffs first allege that Kashi's representations about the amount of protein present in its products are false and misleading because "amino acid content testing" shows that the products contain less protein than the labels state. Compl. ¶¶ 3, 17. But the FDA regulations do not require Kashi to use "amino acid content testing" to calculate the amount of protein in its products. Instead, they provide that, with narrow exceptions not relevant here, "[p]rotein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food."[1] 21 C.F.R. § 101.9(c)(7). Absent any allegation that Kashi's protein quantity representations are inconsistent with the use of the FDA-approved nitrogen method, any attempt to impose liability on Kashi based on a separate testing methodology (*i.e.*, "amino acid content testing") is preempted, as it would effectively require Kashi to calculate protein content in a manner that the FDA does not require.

*Durnford v. MusclePharm Corp.*, 907 F.3d 595 (9th Cir. 2018), is illustrative. There, the plaintiff alleged that the defendant's representations about the quantity of protein in one of its protein supplements was misleading, as that figure "was a product of nitrogen spiking and so not an accurate measurement of true protein content." *Id.* at 601–02. The Ninth Circuit held that this theory was preempted. In so holding, the Ninth Circuit noted that "disclosure of the amount of protein content on the nutrition panel is required by statute, and the proper means of calculating that amount is set out in the regulation." *Id.* at 602. It then noted that 21 C.F.R. § 101.9(c)(7) "allow[s] nitrogen to be used on the nutrition panel as a proxy for protein content." *Id.* at 603. Because the plaintiffs' theory of mislabeling would effectively "permit a state to impose requirements for the measurement of protein for purposes of the federal mandated nutrition panel different from those permitted under the FDCA," the Ninth Circuit concluded that it was preempted. *Id.*

Similarly, in *Mee v. I A Nutrition, Inc.*, the plaintiffs alleged that the defendant's protein

---

[1] The FDA regulations treat 6.25 as the default factor "except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25." 21 C.F.R. § 101.9(c)(7). But whether or not the relevant factor is 6.25, the regulation makes clear that protein content must be calculated based on the "nitrogen content of the food," as opposed to its amino acid composition. *Id.*

supplements were mislabeled "because, according to 'scientific tests' performed for plaintiffs, the actual amount of protein contained in the products is lower than the amount stated."  No. 14-5006, 2015 WL 2251303, at *1 (N.D. Cal. May 13, 2015).  The district court dismissed this claim.  In so holding, it emphasized that 21 C.F.R. § 101.9(c)(7) permits manufacturers to calculate protein content based on a product's nitrogen content and noted that the plaintiffs did "not allege the protein content set forth in the Supplement Facts was not calculated in conformity with § 101.9(c)(7)."  *Id.* at *3.  And while the plaintiffs alleged that the product's nitrogen content "does not result in 'a direct measure of the actual protein content,'" the court concluded that this theory "is preempted, as it seeks to base liability on defendant's failure to employ a testing procedure not imposed by or contained in any federal regulation."  *Id.*

Here, as in *Durnford* and *Mee*, Plaintiffs do not—and cannot—allege that Kashi's protein content claims fail to comply with the FDA-approved nitrogen method.  Instead, they allege only that "amino acid content testing" shows that the challenged Kashi products contain less protein than advertised.  Compl. ¶¶ 3, 17.  But even if that were the case, the FDA regulations do not require the use of "amino acid content testing" to calculate the number of grams of protein per serving.  To the contrary, they expressly permit Kashi to calculate the number of grams of protein per serving based on the product's nitrogen content.  Absent any plausible allegation that Kashi's products contain less protein than advertised when calculated using the FDA-mandated nitrogen method, Plaintiffs' "protein quantity" claim is expressly preempted.

## II.     Plaintiffs' "Protein Quality" Theory Is Also Preempted.

In addition to their "protein quantity" theory, Plaintiffs also allege that Kashi's front-label protein claims are misleading—even though they are identical to the protein content stated in the Nutrition Facts panel—because they "broadly tout protein quantity while ignoring that the poor quality proteins in the Product . . . provide far less useable protein than claimed."  Compl. ¶ 39.  Plaintiffs suggest that these front-label protein claims must be "adjusted . . . based on the [FDA] mandated 'Protein Digestibility Corrected Amino Acid' score."  *Id.* ¶ 4.  But this theory is also preempted, as the FDA regulations do not require manufacturers to correct purely quantitative protein claims to account for protein digestibility.

### A.     The FDA Does Not Require Kashi to Correct Purely Quantitative Protein Claims.

In general, the FDA regulations do not require manufacturers to account for protein digestibility or quality when stating a product's protein content.  *See generally* 58 Fed. Reg. 2079, 2102 (Jan. 6, 1993)

8

(rejecting comments advocating for "mandatory declaration of protein as percent RDI" on all foods).  If a manufacturer places a "protein claim" on a product, however, the FDA requires the manufacturer to calculate the "corrected amount of protein" by multiplying the "actual amount of protein" (*i.e.*, the amount calculated using the nitrogen method) by the product's PDCAAS, which accounts for amino acid composition and digestibility.  21 C.F.R. § 101.9(c)(7)(ii).  The "corrected amount of protein" must be "calculated as a percentage of the RDI or DRV for protein . . . and *expressed as Percent of Daily Value*." *Id.* § 101.9(c)(7)(i) (emphasis added).  But the FDA does not require manufacturers to adjust the *number of grams* of protein, which must be calculated based on the product's nitrogen content as opposed to its amino acid composition.  *See* 81 Fed. Reg. at 33869 ("[P]rotein is estimated by determining the nitrogen content of an ingredient and multiplying it by a nitrogen-to-protein conversion factor."); *see also infra* § I. Plaintiffs cannot use state law to impose a labeling requirement—*i.e.*, an obligation to correct for protein quality when making front-label quantitative protein claims—that the FDA has declined to mandate.

Plaintiffs attempt to circumvent this result by drawing a distinction between statements of protein content within the Nutrition Facts panel and "nutrient content claims" elsewhere on the packaging.  *See* Compl. ¶ 38.  But 21 C.F.R. § 101.9(c)(7) expressly contemplates the possibility that manufacturers will make "protein claims" on their labeling outside the Nutrition Facts panel, which is what triggers the obligation to place a statement of the percent of daily value in the Nutrition Facts panel.  21 C.F.R. § 101.9(c)(7)(i).  And the FDA expressly permits manufacturers to make statements that "do[] not in any way implicitly characterize the level of the nutrient in the food" so long as they are "not false or misleading in any respect."  21 C.F.R. § 101.13(i)(3) (listing "100 calories" or "5 grams of fat" as examples).  There is no serious dispute that Kashi's front-label protein claims, like "13g Protein," comply with this regulation.

Consistent with 21 C.F.R. § 101.13(i)(3), Kashi's front-label protein claims state only the quantity of protein in each serving.  They do not characterize the amount of protein in the product—for example, by describing the product as "high" in protein or a "good source" of protein.  *See* RJN Ex. 1.  The amount of protein on the front of the box is identical to the amount of protein in the Nutrition Facts panel.  *See id.* And while Plaintiffs allege that Kashi's front-label protein claims are misleading because they do not account for protein digestibility, it is well-established that "a statement cannot be 'false or misleading' . . . where challenged conduct is expressly required or permitted by FDA regulations."  *Coe v. Gen. Mills, Inc.*,

No. 15-5112, 2016 WL 4208287, at *4 (N.D. Cal. Aug. 10, 2016) (citation and internal quotation marks omitted); *see also Durnford*, 907 F.3d at 602 (affirming dismissal of similar claim and emphasizing that the FDA's prohibition against "false or misleading statements *in general* does not alter our analysis"). Because the FDA regulations do not require Kashi to account for protein digestibility when calculating the "actual amount of protein," it cannot be misleading for Kashi to place this information on the front label.

Plaintiffs also rely on the FDA's statement that "[i]nformation on protein quantity alone can be misleading on foods that are of low protein quality." Compl. ¶ 39 (quoting 58 Fed. Reg. at 2101–02) (internal quotation marks omitted). Plaintiffs take this statement out of context. While the FDA expressed concern about "low protein quality," it made clear that "the percent of the reference value for protein" was "satisfactory . . . to allow consumers to readily identify foods of low protein quality." 58 Fed. Reg. at 2102. In other words, the FDA concluded that manufacturers do not need to adjust the *number of grams* of protein, so long as they provide consumers with the "corrected amount of protein" in the form of a "percent of daily value." 21 C.F.R. § 101.9(c)(7)(i). Plaintiffs' contrary reading of the regulation—under which Kashi must correct for protein quality *any time* it makes a protein claim outside of the Nutrition Facts panel—is faulty for at least two independent reasons:

First, it is inconsistent with 21 C.F.R. § 101.13(o), which provides that any nutrient content claim—including a claim about the quantity of protein—must be consistent with "the analytical methodology prescribed for determining compliance with nutrition labeling in § 101.9." 21 C.F.R. § 101.13(o); *see also Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1121 n.6 (N.D. Cal. 2010) (noting that "[t]he 'analytical methodology' phrase refers to the [FDA]'s preferred mechanism for measuring actual nutrient levels in food products"). Because 21 C.F.R. § 101.9(c)(7) requires Kashi to calculate the "actual amount of protein" based on the product's nitrogen content *without* accounting for protein digestibility, requiring Kashi to correct for protein digestibility when making front-label protein claims would force it to use two different analytical methodologies when making quantitative protein claims. Plaintiffs' reading of the regulation is therefore "inconsistent with the text of the regulation as a whole," as it ignores the requirement that nutrient content claims must be based on the same analytical methodology used in the Nutrition Facts panel. *Attias v. Crandall*, 968 F.3d 931, 938 (9th Cir. 2020); *cf. Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) (noting that courts must "mak[e] every effort not to interpret a provision in a

manner that renders other provisions of the same statute inconsistent, meaningless or superfluous").

Second, Plaintiffs' interpretation of the regulation would result in consumer confusion by forcing Kashi to provide differing—and inconsistent—measurements of protein content on the front of the box and in the Nutrition Facts panel.  The FDA has made clear that it "believes . . . that it is more important to prevent consumer confusion by having consistency on the food label than to be prescriptive as to the method by which nutrient values . . . are determined and used."  58 Fed. Reg. 44020, 44024 (Aug. 18, 1993).  The FDA has subsequently reiterated "its belief in the importance of consistency between nutrient content claims and information in the nutrition label to prevent consumer confusion."  62 Fed. Reg. 67775, 67778 (Dec. 30, 1997).  And it has advised manufacturers that "FOP [Front-of-Package] . . .  labeling . . . that provides consumers with readily accessible information about a product's nutritional profile, *in a manner that is consistent with and linked to the required Nutrition Facts panel*, responds to today's marketplace realities and can be part of the education and outreach consumers need to understand and act on nutrition information at the point of purchase."  FDA, *Guidance for Industry: Letter Regarding Point of Purchase Food Labeling* (Oct. 2009) (emphasis added) (RJN Ex. 6).

Given those repeated admonitions, it is implausible that the FDA would want—let alone require—manufacturers to place a different protein measurement on the front of the package than it requires them to place in the Nutrition Facts panel.  But Plaintiffs' reading of the regulations would do just that: it would force manufacturers to place the uncorrected number of grams of protein (*i.e.*, the "actual amount of protein," 21 C.F.R. § 101.9(c)(7)(ii)) in the Nutrition Facts panel, but to place another, lower number on the front of the package to account for the protein's quality and digestibility.[2]  Had the FDA intended to require manufacturers to place different protein measurements on the front of the package and in the Nutrition Facts panel, it could have—and would have—said so explicitly.  In light of the FDA's stated desire for consistency between front-of-package labeling and the Nutrition Facts panel, this Court should

---

[2] Plaintiffs will likely point to Judge Seeborg's decision in *Minor v. Baker Mills, Inc.*, No. 20-2901, 2020 WL 11564643 (N.D. Cal. Nov. 12, 2020) to support their argument that the FDA regulations require manufacturers to correct front-label protein claims to account for protein quality.  But Judge Seeborg has subsequently retreated from his opinion in *Minor* and has recognized that there is "at least an argument that requiring adjustments for digestibility when calculating '% Daily Value' is not inconsistent with allowing the number of grams of protein, calculated by the nitrogen method, to be stated on the box without such adjustments."  RJN Ex. 7 (order from *Chong v. KIND LLC*, Case No. 21-4528 (Sept. 23, 2021)).

decline to interpret 21 C.F.R. § 101.9(c)(7) in a way that would require two different protein claims.

**B.      The FDA Has Rejected Plaintiffs' Interpretation of 21 C.F.R. § 101.9(c)(7).**

Although Plaintiffs' interpretation of 21 C.F.R. § 101.9(c)(7) is faulty even when viewed in isolation, it is even more untenable in light of the FDA's explicit guidance that "[o]ur regulations do not require that the gram amount of protein declared in a quantitative statement made outside the Nutrition Facts panel be corrected for protein digestibility." RJN Ex. 4. This Court should decline to adopt a reading of 21 C.F.R. § 101.9(c)(7) that conflicts with the FDA's interpretation of its own regulation.

After Plaintiffs initially threatened this lawsuit against Kashi, one of Kashi's outside attorneys, Ricardo Carvajal, contacted the FDA's Center for Food Science and Applied Nutrition ("CFSAN"), which invites interested parties to submit questions relating to the application of the FDA regulations through the FDA's "Technical Assistance Network." *See* RJN Ex. 2–3. In his email to the FDA, Mr. Carvajal noted that manufacturers had historically interpreted 21 C.F.R. § 101.9(c)(7) "to require (1) that a quantitative statement of protein be based on the actual amount of protein as determined by the nitrogen method (regardless of whether that statement appears only in the NF [Nutrition Facts], or in both the NF and as a protein claim outside the NF), and (2) that the %DV statement be based on the corrected amount of protein as determined by PDCAAS." RJN Ex. 4. Nonetheless, Mr. Carvajal noted, "some individuals have argued that any quantitative statement of protein made outside the NF must be based on the corrected amount of protein as determined by PDCAAS." *Id.* In light of these competing interpretations of the regulation, Mr. Carvajal asked: "Does CFSAN agree with industry's historical interpretation, or does CFSAN think that any quantitative statement of protein made outside the NF must be based on the corrected amount of protein as determined by PDCAAS?" *Id.* The FDA's response could not have been clearer: "**Our regulations <u>do not require</u> that the gram amount of protein declared in a quantitative statement made outside the Nutrition Facts panel be corrected for protein digestibility**." *Id.* (emphasis added).

The FDA has taken the same position in response to similar inquiries. For example, when other consumers (represented by the same attorneys who represent Plaintiffs here) threatened a similar lawsuit against KIND, KIND's counsel at Covington & Burling, Andrew Do, contacted CFSAN and asked whether, if KIND "wanted to display the amount of protein on the front of pack (*i.e.*, a protein statement such as '8g Protein')," KIND should "use the *amount* as displayed in the NFL [Nutrition Facts Label],"

rather than a lower amount that accounted for protein digestibility.  RJN Ex. 5.  CFSAN responded:

> Quantitative information about a nutrient, such as protein, that is displayed on the front of the package is considered a nutrient content claim in accordance with 21 C.F.R. 101.13(i)(3), and must be consistent with the declaration of the quantitative amount of protein declared in the Nutrition Facts label.  **Therefore**, **if the amount of protein declared in the Nutrition Facts label is "8g," the nutrient content claim on the front of the package must also state "8g."**

*Id.* (emphasis added).  In other words, the FDA has consistently taken the position that manufacturers need not correct front-label quantitative claims to account for protein digestibility and that the amount of protein stated on the front label should match the amount of protein in the Nutrition Facts panel.  This Court should defer to the FDA's interpretation of this regulation for two separate reasons:

First, "where an agency interprets its own regulation, even if through an informal process, its interpretation of an ambiguous regulation is controlling . . . unless 'plainly erroneous or inconsistent with the regulation.'" *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2410–14 (2019) (holding that an agency's interpretation of a "genuinely ambiguous" regulation is entitled to deference based on the "presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities").  To be clear, neither the text nor purpose of 21 C.F.R. § 101.9(c)(7) require manufacturers to correct front-label quantitative claims to account for protein digestibility, and Plaintiffs' interpretation of the regulation would result in inconsistencies and absurd results.  *See supra* § II.A.  But even if the Court concluded that 21 C.F.R. § 101.9(c)(7) was susceptible of multiple interpretations (*i.e.*, "genuinely ambiguous") even after exhausting other tools of regulatory interpretation, *Auer* and *Kisor* make clear that the Court must defer to the FDA's interpretation of its own regulation—under which Kashi has no obligation to correct its front-label quantitative protein claims to account for protein quality.

Second, even if the FDA's interpretation of 21 C.F.R. § 101.9(c)(7) were not entitled to deference under *Auer* and *Kisor*, it would nonetheless be entitled to "a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012) (citations and internal quotation marks omitted); *accord*

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  This type of deference, known as *Skidmore* deference, is particularly appropriate where, as here "the regulatory scheme is highly detailed" and the agency "can bring the benefit of specialized experience to bear on" the issues implicated by the regulation.  *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001).  And as the Supreme Court has made clear, *Skidmore* deference applies *regardless* of whether the agency's interpretation is otherwise entitled to controlling weight under *Auer* and its progeny.  *See Kisor*, 139 S. Ct. at 2414.

Here, several factors weigh in favor of deferring to the FDA's interpretation of its own regulations. It is beyond dispute that the relevant question—whether manufacturers must correct front-label quantitative protein claims to account for protein quality—"implicate[s] complex technical or policy questions . . . better addressed, in the first instance, by the FDA."  *Romero v. Flowers Bakeries, LLC*, No. 14-5189, 2015 WL 2125004, at *6 (N.D. Cal. May 6, 2015); *see also, e.g.*, *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 139 (E.D.N.Y. 2018) ("[I]t is clear that it is the FDA's role to decide what calculation methods manufacturers may use, not the courts.").  Moreover, deference to the FDA's interpretation of its own regulations is particularly warranted given the significant interest in uniform, nationwide food labeling standards.[3]  Absent deference to the FDA's interpretation of its own regulations, courts may reach different conclusions in cases involving different manufacturers, resulting in a patchwork of labeling standards and undermining Congress's interest in nationwide uniformity.

*Skidmore* also requires this Court to consider "whether the agency has applied its position with consistency."  *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (citations omitted).  Here, CFSAN has consistently informed manufacturers that the FDA regulations do not require them to correct front-label quantitative protein claims to account for protein digestibility.  *See* RJN Exs. 4–5.  There is no evidence that the FDA has taken the opposite position—in formal rulemaking, in informal guidance, in warning letters, or even in response to inquiries from other manufacturers.  The consistent, uniform position of the FDA on this issue weighs in favor of applying *Skidmore* deference here.

Most importantly, the FDA's interpretation of 21 C.F.R. § 101.9(c)(7) is consistent with both the

---

[3] *See generally, e.g.*, *Perea v. Walgreen Co.*, 939 F. Supp. 2d 1026, 1038 (C.D. Cal. 2013) (noting "the purpose of the NLEA to promote uniformity in food labeling"); *Hood v. Wholesoy & Co.*, No. 12-5550, 2013 WL 3553979, at *5 (N.D. Cal. July 12, 2013) ("Food labeling enforcement is a matter that Congress has indicated requires the FDA's expertise and uniformity in administration.").

text of the regulation (which requires the "corrected amount of protein" to be "expressed as Percent of Daily Value," 21 C.F.R § 101.9(c)(7)(i)) and with 21 C.F.R. § 101.13(o), which requires nutrient content claims to be calculated using the same "analytical methodology" used in the Nutrition Facts panel.  Indeed, both responses from CFSAN expressly distinguished between Plaintiffs' purported requirement to correct *quantitative statements* about protein content to account for protein digestibility and the *actual* requirement imposed by the regulation—*i.e.*, to state the "corrected amount of protein" as a "Percent of Daily Value." *See* RJN Ex. 4–5.  This Court should accordingly defer to the FDA's determination that the FDA regulations do not require Kashi to correct its front-label quantitative claims to account for protein quality.

At a minimum, if this Court is not willing to defer to the FDA's view that 21 C.F.R. § 101.9(c)(7) does not require Kashi to correct purely quantitative protein claims to account for protein quality or digestibility, it should stay this case until the FDA provides more authoritative guidance.  When "a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch," it should stay the case in deference to the agency's primary jurisdiction. *Clark v. Time Warner Cable, Inc.*, 523 F.3d 1110, 1114–1115 (9th Cir. 2008).

The issue presented by this lawsuit—the proper method for calculating protein in food labeling—is precisely the sort of technical, specialized issue that falls within the FDA's bailiwick.  Moreover, if this Court allows Plaintiff's lawsuit to proceed, it "runs the risk of issuing a decision that is inconsistent with the FDA's regulatory scheme or later-issued guidance." *Haggag v. Welch Foods, Inc.*, No. 13-341, 2014 WL 1246299, at *6 (C.D. Cal. Mar. 24, 2014).  To be clear, the FDA's guidance warrants the dismissal of this lawsuit: either the regulations clearly do not require Kashi to account for protein quality or digestibility when making front-label claims, in which case Plaintiffs' lawsuit fails on its merits, or they are genuinely ambiguous, in which case *Auer* and *Kisor* compel this Court to defer to the FDA's interpretation of its own regulations.  But if the Court is not inclined to dismiss this case outright, it should stay this action in deference to the FDA's primary jurisdiction in lieu of allowing Plaintiffs' claims to proceed.

## CONCLUSION

Because Plaintiffs' claims against Kashi are preempted, this Court should dismiss their complaint.

1    DATED:  November 3, 2021                    JENNER & BLOCK LLP

2
                                          By:        /s/   Dean N. Panos
3                                                    Dean N. Panos

4                                          Attorneys for Defendant
5                                          Kashi Company

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 3:21-CV-7036-VC