1 | **GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
2 | MARIE A. MCCRARY (State Bar No. 262670)
HAYLEY REYNOLDS (State Bar No. 306427)
3 | 100 Pine Street, Suite 1250
San Francisco, CA 94111
4 | Telephone: (415) 639-9090
Facsimile: (415) 449-6469
5 |
KALI R. BACKER (admitted *pro hac vice*)
6 | 4450 Arapahoe Ave., Suite 100
Boulder, CO 80303
7 | Telephone: (415) 639-9090
Facsimile: (415) 449-6469
8 |
Attorneys for Plaintiffs
9 |

10 | UNITED STATES DISTRICT COURT FOR THE

11 | NORTHERN DISTRICT OF CALIFORNIA

12 |

13 | ELENA NACARINO and MEGAN TAYLOR, as individuals, on behalf of themselves, the general public and those similarly situated,

CASE NO. 3:21-CV-07036-VC

14 |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

15 | Plaintiffs,

16 | Date: December 16, 2021
Time: 10:00 AM
Ctrm: 4

17 | v.

18 | KASHI COMPANY

HONORABLE VINCE CHHABRIA

19 | Defendant.

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 1

II.    BACKGROUND ...................................................................................................... 2

    A.   PDCAAS reveals that Kashi's nitrogen-based orotein claim is misleading. ....2

    B.   The regulatory framework. ................................................................................ 3

III.   ARGUMENT ............................................................................................................ 3

    A.   Plaintiffs' claim that Kashi's front label claim of "11g protein" is misleading
        parallels FDA regulations. .............................................................................. 3

    B.   Kashi cannot establish that FDA expressly authorizes its "11g Protein" claim
        on the front package. ........................................................................................ 5

        1. Kashi's back panel regulations do not authorize its front label claim. ...... 5

        2. Section 101.13(o) does not authorize Kashi's front label claim ............... 9

    C.   Kashi's arguments related to Plaintiffs' proposed forms of compliance are
        wrong and miss the point. .............................................................................. 10

        1. Plaintiffs' proposed forms of compliance do not impose additional
        requirements; Kashi still remains liable for its misleading claims ............ 11

        2. Kashi's emails are not entitled to any deference ................................... 12

    D.   Kashi's remaining arguments are without merit. ........................................... 14

    E.   The primary jurisdiction doctrine does not apply. ......................................... 15

**TABLE OF AUTHORITIES**

*Cases*

*Astiana v. Hain Celestial Group, Inc*., 783 F.3d 753 (9th Cir. 2015) ...........................................15

*Barron v. Snyder's-Lance, Inc*., 2015 U.S. Dist. LEXIS 189625 (11th Cir. 2015)........................12

*Bassiri v. Xerox Corp*., 463 F.3d 927 (9th Cir. 2006) .....................................................................14

*Bates v. DowAgrosciences LLC*, 544 U.S. 431 (2005)....................................................................11

*Bruton v. Gerber Products Co*., 961 F.Supp. 2d 1062 (N.D. Cal. 2013) .......................................16

*Clark v. Time Warner Cable,* 523 F.3d 1110 (9th Cir. 2008)........................................................15

*Durnford v. MusclePharm Corp*., 907 F. 3d 595 (9th Cir. 2018)......................................................7

*Fitzhenry-Russell v. Coca-Cola Co.*, 2017 U.S. Dist. LEXIS 172716 (N.D. Cal. Oct. 18, 2017) ...4

*Gubala v. CVS Pharmacy, Inc.,* 2016 U.S. Dist. LEXIS 32759 (N.D. Ill. Mar. 15, 2016) ..........1, 4

*Hall v. United States Dep't of Agric.*, 984 F.3d 825 (9th Cir. 2020) ..............................................14

*Hardeman v. Monsanto Co*., 997 F.3d 941 (9th Cir. 2021)..............................................................14

*Hawkins v. Kroger Co.*, 906 F.3d 763 (9th Cir. 2018) .....................................................1, 3, 6, 9, 13

*Jones v. ConAgra Foods, Inc*., 912 F.Supp. 2d 889 (N.D. Cal. 2012) ...........................................16

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)....................................................................................12, 14

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)..............................................................................4

*Lily v. ConAgra Foods, Inc*., 743 F. 3d 662 (9th Cir. 2014) ...........................................................3

*Mee v. I A Nutrition, Inc*., 2015 U.S. Dist. LEXIS 63038 (N.D. Cal. 2015) ...................................7

*Minor v. Baker Mills, Inc*., No. 20-cv-0290, ECF 35 (N.D. Cal. Nov. 12, 2020) ...........................1

*Porter v. NBTY, Inc. (Porter I)* 2016 U.S. Dist. LEXIS 163352 (N.D. Ill. Nov. 28, 2016) ....passim

*Porter v. NBTY, Inc. (Porter II)*, No. 15 CV 11459, 2019 U.S. Dist. LEXIS 190495 (N.D. Ill. Nov. 4, 2019) ..................................................................................................................passim

*Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015) .............................................passim

*Snarr v. Cento Fine Foods Inc*., 2019 U.S. Dist. LEXIS 220063 (N.D. Cal. Dec. 23, 2019).........4

*Takla v. Regents of the Univ. of Cal.*, 2015 U.S. Dist. LEXIS 150587 (C.D. Cal. Nov. 2, 2015) .12

*Ulrich v. Probalance, Inc.*, 2017 U.S. Dist. LEXIS 132202 (N.D. Ill. Aug. 18, 2017) .....1, 4, 5, 12

*Williams v. Gerber Prods. Co.*, 552 F. 3d 934 (9th Cir. 2008) ........................................................8

**Regulations**

21 C.F.R. § 10.90(k) ...................................................................................................14

21 C.F.R. § 101.13(c) .........................................................................................passim

21 C.F.R. § 101.13(i)(3) ...................................................................................................5

21 C.F.R.§ 101.13(o) ...................................................................................................9

21 C.F.R. § 101.9(c)(7)(i)-(ii).....................................................................................3

21 C.F.R. §101.9(c)(7)...................................................................................................10

21 C.F.R. §101.9(c)(7)(ii)...................................................................................................10

21 C.F.R. § 101.9(c)(7)(i) ...................................................................................................8

58 Fed. Reg. 2079 ...................................................................................................7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.      INTRODUCTION**

Kashi prominently advertises "11g Protein" on the front of its Cinnamon Crisp cereal. In reality, the product provides only 7 grams of protein nutritionally, i.e., *almost 40% less than claimed*, because Kashi uses poor quality protein sources that humans cannot fully digest and that are deficient in certain amino acids essential to human protein synthesis. FDA regulations specifically prohibit manufacturers from making "a statement about the *amount or percentage* of a nutrient" on the front label of a product if that statement is "false or misleading *in any respect*." 21 C.F.R. § 101.13(i)(3) (emphasis added). By advertising 11 grams of protein when its products provide nutritionally only 7 grams, Kashi misleads consumers about the amount of protein they will actually receive from consuming the product, which violates both state and federal law. Because Plaintiffs' state law claims directly parallel federal requirements, their claims are not preempted. *Every court* to address this specific issue has so held. *E.g., Porter v. NBTY, Inc.* (*Porter I*), 2016 U.S. Dist. LEXIS 163352, at *17-18 (N.D. Ill. Nov. 28, 2016); *Ulrich v. Probalance, Inc.*, 2017 U.S. Dist. LEXIS 132202, at *11-12 (N.D. Ill. Aug. 18, 2017); *Gubala v. CVS Pharmacy, Inc.,* 2016 U.S. Dist. LEXIS 32759, at *40 (N.D. Ill. Mar. 15, 2016); *Minor v. Baker Mills, Inc.*, No. 20-cv-0290, ECF 35, p. 6 (N.D. Cal. Nov. 12, 2020).

Kashi creates a false narrative of preemption by relying on regulations and case law that pertain to what it can state on the *back nutrition facts panel* (NFP) of its products. Essentially, Kashi argues that because the regulations allow it to calculate protein content for the NFP using the nitrogen method, it is necessarily permitted to do so on the front of its package. But "the rules that govern claims made within the Nutrition Facts Panel and the rules that govern nutrition content claims elsewhere on the label are different." *Hawkins v. Kroger Co.*, 906 F.3d 763, 770 (9th Cir. 2018). In particular, front-label claims—which capture consumers' attention and induce them to purchase products—are subject to heightened scrutiny, including the prohibition on stating an amount of a nutrient (such as protein) if it is misleading "in any respect." *Id.* As a result, the Ninth Circuit has explicitly held that "'*a requirement to state certain facts in the nutrition label is not a license to make that statement elsewhere on the product.*'" *Id.* at 767 (emphasis in original, quoting *Reid v. Johnson & Johnson*, 780 F.3d 952, 960 (9th Cir. 2015)). By

-1-

1  asking the Court to bless its front label claim because the regulations allow it in the NFP, Kashi is

2  asking this Court to take a path expressly foreclosed by Ninth Circuit precedent.

3        Kashi's remaining arguments are all based on its attempt to add confusion by reframing

4  Plaintiffs' claims as requiring certain alternative statements on the front, which Kashi contends

5  are preempted for various reasons. But Plaintiffs' claims in no way depend on any alternative

6  statement. State and federal law agree that Kashi was not permitted to say "11g Protein" because

7  that amount is misleading. Kashi can therefore be held liable for making that claim, and the claim

8  can simply come off the label. Any question of alternative statements affects only the scope of the

9  injunctive *remedies* in this case, not Kashi's *liability*.

10  **II.     BACKGROUND**

11        **A.     PDCAAS reveals that Kashi's Nitrogen-Based Protein Claim is Misleading.**

12        Nitrogen testing is a way to estimate protein *quantity* by multiplying the nitrogen content

13  of a food by an average conversion factor. Nitrogen testing does not account in any way for

14  protein *quality*—i.e., how much of the estimated protein a human can actually use. 21 C.F.R. §

15  101.9(c)(7); *see also Porter v. NBTY, Inc.* (*Porter I*), 2016 U.S. Dist. LEXIS 163352, *16 (N.D.

16  Ill. Nov. 28, 2016) ("the nitrogen method is not the most accurate way to describe protein

17  content.").

18        The Protein Digestibility Corrected Amino Acid Score, known by its acronym PDCAAS,

19  is a measure of protein *quality*—i.e., the amount of the total protein that can actually be used as

20  protein in the human body. ECF 1 at ¶¶ 4, 27-28. It does this by first measuring the amount and

21  types of amino acids, and then applying a percent digestibility. *Id*. The first step is critical because

22  a human's body requires nine essential amino acids to synthesize protein from any food. *Id*. at ¶

23  25. Protein synthesis shuts down after the body uses up the least prevalent essential amino acid,

24  with the remaining amino acids degrading mostly into waste. *Id.* The second step is also important

25  for determining the amount of protein useable by the human body because not all proteins are fully

26  digestible by humans—this is especially true of proteins derived from plants—and the undigestible

27  portion of the protein content is similarly unavailable for human protein synthesis. *Id*. at ¶¶ 26-27.

28  The percent digestibility captures this. *Id.*  PDCAAS combines these results into a discount factor

Pls.' Opp. to Def.'s Mtn. to Dismiss

1   (e.g., 0.5 or 0.6) that, when multiplied by protein quantity in grams, shows how much protein a

2   product actually provides for human nutritional purposes, also in grams. *Id*. at ¶¶ 27-28. FDA

3   regulations refer to this as the "corrected amount of protein (gram) per serving." *See* 21 C.F.R. §

4   101.9(c)(7)(i)-(ii).

5       Kashi's own PDCAAS testing shows that, despite claiming 11g protein on the front of its

6   products based on nitrogen testing, it provides nutritionally only 7 grams of protein. ECF 1 at ¶ 4.

7   **B.    The regulatory framework.**

8       FDA regulations create two different sets of rules: one for front of pack nutrient claims via

9   § 101.13, and one for the NFP via § 101.9. *See Hawkins*, 906 F.3d at 770. This dichotomy results

10  from § 101.13(c) which specifically provides that statements in the NFP are ***not*** considered

11  nutrient content claims and are not subject to the requirements of § 101.13, but ***if that same***

12  ***information*** is declared "elsewhere on the label or in labeling, it is a nutrient content claim and is

13  subject to the requirements for nutrient content claims." *Id*. § 101.13 (c). As a result, information

14  taken from the NFP is subjected to heightened scrutiny when it is placed on the front of a package

15  to advertise a product. One of those extra measures of scrutiny is § 101.13(i)(3), which

16  specifically prohibits a manufacturer from stating any "***amount*** or percentage of a nutrient" if that

17  amount is "false or misleading ***in any respect***." *Id.* § 101.13(i)(3) (emphasis added). If a nutrient

18  claim violates any provision of § 101.13, then it "may not be made on the label." *Id.* § 101.13(b).

19  **III.    ARGUMENT**

20  **A.    Plaintiffs' claim that Kashi's front label claim of "11g protein" is misleading
        parallels FDA regulations.**

21      The FDCA does not preempt state law claims if those claims seek to enforce requirements

22  identical to those in the federal regulations. *See Lily v. ConAgra Foods, Inc*., 743 F. 3d 662, 665

23  (9th Cir. 2014). State and federal law agree that statements about the "amount or percentage of a

24  nutrient" like protein cannot be "false or misleading in any respect" when made on the front of a

25  package. 21 C.F.R. § 101.13(c) & (i)(3); *see also* ECF 1 at ¶¶ 33, 40, 42-43, 76-153. Here,

26  Plaintiffs have plausibly alleged that Kashi's standalone, nitrogen-based protein amount on the

27  front of the package is misleading because it fails to account for Kashi's poor protein quality. For

28  example, Kashi's front label says "11g Protein" even though its own testing shows that only

-3-

1   seven grams are *actually usable by the human body.* ECF 1 at ¶¶ 4, 17, 22-29.[1] As such, Kashi's

2   label misleads consumers about the amount of protein they will actually receive from consuming

3   the product. Because state and federal law are parallel in this respect, every court to address

4   preemption in the specific context of a claim that a front-of-pack protein statement is misleading

5   has held that the claim is not preempted. *See, e.g., Minor v. Baker Mills, Inc*. No. 20-cv-0290,

6   ECF 35 (N.D. Cal. Nov. 12, 2020); *Ulrich v. Probalance, Inc.*, 2017 U.S. Dist. LEXIS 132202,

7   *11-12 (N.D. Ill. Aug. 18, 2017); *Porter I*, 2016 U.S. Dist. LEXIS 163352 at *17-18; *Gubala v.*

8   *CVS Pharmacy, Inc.,* 2016 U.S. Dist. LEXIS 32759, *40 (N.D. Ill. Mar. 15, 2016).

9   　　　*Porter* is instructive. There, the front label was "60g Premium Protein."[2] *Porter I*, 2016

10   U.S. Dist. LEXIS 163352 at *4. Although nitrogen testing supported the 60 gram figure, plaintiffs

11   alleged that the protein claim was misleading because the defendant added in non-essential amino

12   acids that are high in nitrogen but of little nutritional value. *Id.,* at *5-6. This allowed the

13   defendant to claim a higher protein content than the products actually delivered. *Id.* Defendant

14   argued that the claim was preempted, because the "regulations permit manufacturers to calculate

15   the total amount of protein" using the nitrogen method. *Id.,* at *14-15. The court rejected this

16   argument and held that the claim was "not preempted" because plaintiffs plausibly alleged that

17   "***defendants failed to account for the protein quality*** in making the front-label statement,

18   resulting in the type of ***false or misleading statement prohibited by § 101.13(i)(3)***." *Id.,* at *17-18

19   (emphasis added).

20   　　　*Ulrich* similarly dealt with a claim in which the defendant added low quality collagen

---

[1] Kashi requests judicial notice for what it contends is "the label" for the Cinnamon Crisp cereal, but has attached an image of the product that ***is different*** from the image and allegations in the Complaint. *Compare* ECF 22, Ex. 1 *with* ECF 1 at ¶ 16. That is a fact dispute, and at this stage the Complaint must control. Kashi has also not properly authenticated the label, and it is unclear when (if ever) it was in use or if it changed during the class period. The Court should deny Kashi's request. *See, e.g., Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Snarr v. Cento Fine Foods Inc.*, 2019 U.S. Dist. LEXIS 220063, *4-5 (N.D. Cal. Dec. 23, 2019); *Fitzhenry-Russell v. Coca-Cola Co.*, 2017 U.S. Dist. LEXIS 172716, at *2 n.1 (N.D. Cal. Oct. 18, 2017).

[2] The claim's use of the term "premium" in *Porter* makes no difference. The protein claim was misleading because the product did not provide the amount of protein claimed. *Porter I*, 2016 U.S. Dist. LEXIS 163352 at *4. As the court stated: "If the nitrogen method is exploited to inflate protein content, then *the amount of protein listed on the front label* may be false or misleading." *Porter v. NBTY, Inc. (Porter II)*, 2019 U.S. Dist. LEXIS 190495, at *10 (N.D. Ill. Nov. 4, 2019).

Pls.' Opp. to Def.'s Mtn. to Dismiss

1   proteins to its products, which "result[ed] in Products that effectively had less protein than they

2   advertise" because "collagen protein is less digestible." *Ulrich*, 2017 U.S. Dist. LEXIS 132202, at

3   *9-11. The court held that the claims were "not preempted." *Id.* at *12. As the Court reasoned, "it

4   appears to be a fair inference that [the] use of collagen protein isolate in its blend of proteins must

5   have reduced digestibility of the protein in the Products" and it may "be misleading in a particular

6   context to use the nitrogen method, and misleading labeling violates the FDCA and

7   accompanying regulations." *Id.* at *10-11.

8          Plaintiffs' claims here are identical to *Ulrich* and indistinguishable from *Porter* as far as

9   preemption is concerned. Kashi uses low quality protein sources in its products that have

10   PDCAAS scores of between 0.4 and 0.5. ECF 1 at ¶ 28. ***Nutritionally speaking, this means***

11   ***Kashi products provide—in a form humans can use—only 7 of the 11 grams of protein claimed***

12   ***on its labels***. ECF 1 at ¶ 17. By advertising just the quantity figure based on nitrogen testing,

13   Kashi's front label is misleading in violation of the FDCA and 21 C.F.R. § 101.13(i)(3).

14   Plaintiffs' state claims mirror FDA regulations and, therefore, are not preempted.

   **B.     Kashi cannot establish that FDA expressly authorizes its "11g Protein" claim on**
15   **the front package.**

16          Because Plaintiffs' claims parallel the regulations, i.e., § 101.13(i)(3), Kashi can establish

17   preemption only if it can demonstrate that FDA ***expressly authorizes*** front-label protein quantity

18   claims based solely on nitrogen testing. *See Reid*, 780 F.3d at 962 ("[t]he preemption analysis of

19   the 'No Trans Fat' claim turns on whether the statement is authorized by FDA regulations.");

20   *Hawkins*, 906 F.3d at 770 ("if FDA regulations ***expressly permit*** the claim '0g Trans Fat per

21   serving' on the face of a product's packaging, any state law claim to the contrary would be

22   preempted.") (emphasis added). Kashi has not done and cannot do this

   **1.     *Kashi's back panel regulations do not authorize its front label claim.***
23

24          The critical flaw with Kashi's preemption argument is that it relies on regulations and case

25   law that relate to the information permitted *inside the nutrient facts panel*. Kashi makes two

26   arguments stemming from these regulations: first, it claims that because FDA regulations permit

27   nitrogen testing to quantify protein inside the NFP, it must be permitted to make that same protein

28

1   quantity statement elsewhere on the packaging; and second, it argues that its front label claims

2   cannot be misleading because it provided a percent daily value in the NFP. ECF 21 at 7-8, 15-16.

3   　　　The Ninth Circuit squarely rejected the first argument in *Reid*, where it held that *"a*

4   requirement to state certain facts in the nutrition label is not a license to make that statement

5   elsewhere on the product." *Reid*, 780 F.3d at 960. Different rules apply to nutrient content

6   claims—they are subject to section 101.13(i)(3), while claims made inside the NFP are not. *See*

7   *Hawkins*, 906 F.3d at 770. FDA thus imposes heightened scrutiny on nutrient content claims: the

8   only way a product can make a claim about the *amount* of a nutrient is if it is not "false or

9   misleading in any respect." If, as a matter of law, a statement made in the NFP could never be

10  misleading, then sections 101.13 (c) & (i)(3) would be meaningless; NFP statements are almost

11  exclusively amounts and percentages. *Accord Porter II*, 2019 U.S. Dist. LEXIS 190495, at *9

12  ("That a protein-content calculation might be misleading when on the front label but permitted in

13  the nutrition panel does not mean plaintiffs' theory fails as a matter of law.")

14  　　　*Reid* and *Hawkins* addressed the issue within the trans fat context. In *Reid*, the products

15  contained approximately 0.5 grams of trans fat per serving, which NFP regulations permitted to

16  be rounded to "0 grams of trans fat" for the back panel. *Reid*, 780 F.3d at 963. The defendant

17  stated "No Trans Fat" on the front label, which it contended was permissible because it was

18  "synonymous" with what FDA regulations *required* for the NFP. *Id.* The Ninth Circuit agreed the

19  statements were equivalent, but held "it makes no difference here." *Id.* "While a required

20  statement inside a nutrition label escapes regulations reserved for nutrient content claims, ***the***

21  ***identical statement outside of the nutrition label is still considered a nutrient content claim and***

22  ***is therefore subject to section 101.13***," which prohibits nutrient content claims from being

23  misleading in any respect. *Id.* (emphasis added). Since the defendant's products contained up to

24  0.5 grams of trans fat per serving, "its 'No Trans Fat' claim is misleading in at least one respect."

25  *Id.* Accordingly, the regulations specifying what was permissible within the NFP did not preempt

26  the plaintiff's claims about what was misleading on the front of the package. *Id.* In *Hawkins,* the

27  Ninth Circuit extended this point to the front label statement "0 grams trans fat per serving,"

28  which was *identical* to the statement *required* in the NFP. 906 F.3d at 766, 771-72.

Pls.' Opp. to Def.'s Mtn. to Dismiss

1    *Reid* and *Hawkins* foreclose any argument that Kashi may state nitrogen quantity on the

2    front package simply because the regulations allow it to do so inside the NFP. Just as in *Reid* and

3    *Hawkins*, Kashi's front label statements are misleading in violation of § 101.13(i)(3) and parallel

4    state laws, so the mere existence of regulations permitting Kashi to make protein quantity claims

5    inside the NFP does not preempt Plaintiffs' claims as to the front of the package.

6          Kashi does not discuss *Reid* or *Hawkins* and, instead, relies on *Dunford* and *Mee*. Both of

7    those cases are irrelevant because they involved claims that statements *inside the NFP* were

8    misleading. *See Durnford v. MusclePharm Corp.*, 907 F. 3d 595, 599-601 (9th Cir. 2018)

9    (plaintiff "was misled by the 40-gram figure on the Supplement's nutrition panel"); *Mee v. I A*

10   *Nutrition, Inc.*, 2015 U.S. Dist. LEXIS 63038, *7-8 (N.D. Cal. May 13, 2015) (claims based on

11   "the amount of protein in the 'Supplement Facts' section on the back" were preempted); *accord*

12   *Porter II*, 2019 U.S. Dist. LEXIS 190495, at *7 (distinguishing *Durnford* on this ground).

13         Kashi's other argument—i.e., that its front label claims cannot be misleading as a matter

14   of law because it included a percent of daily value (%DV) in the NFP—is similarly unavailing.

15   ECF 21 at 15-16. Section 101.9(c)(7)(i) requires that if a product makes a "protein claim" the

16   manufacturer must state a %DV inside the NFP based on PDCAAS. The FDA required this to

17   ensure that consumers have information about protein quality "to prevent them from being *misled*

18   *by information on only the amount of protein present.*" 58 Fed. Reg. 2079 at 2101-2 (emphasis

19   added). Indeed, the FDA explicitly acknowledged that "[i]nformation on protein *quantity alone*

20   can be misleading on foods that are of low protein quality." *Id.* (emphasis added). Kashi argues

21   that including a %DV on the back gives it a safe harbor from liability for stating a quantitative

22   amount of protein *alone* on the front package—even though FDA has explicitly recognized that

23   this information is misleading when presented alone. That makes no sense for several reasons.

24         First, nothing in the regulation remotely suggests that it has anything to do with front label

25   quantitative statements, or excuses them from complying with § 101.13(i)(3). Instead it is clear

26   that this regulation's requirement to place a %DV on the back is *in addition* to any of the other

27   requirements of § 101.13 for protein claims, not *instead of* them.

28         Second, it is clear FDA intended the %DV on the back to prevent the required protein

1   quantity *on the back* from being misleading, and that it has nothing to do with a quantitative

2   statement on the front. Kashi ignores that a "protein claim" under § 101.9(c)(7)(i) is broad; it does

3   not have to be a quantitative "amount" in grams that triggers it. A "protein claim" could be, for

4   example, a more subjective "Good source of Protein" or "Protein-Packed." As such, this

5   regulation envisions a consumer seeing that type of claim and having to flip to the NFP to

6   determine specifically what it means, where the consumer would then see *both* protein quantity in

7   grams *and* protein quality via the percent daily value *at the same time*. After all, the FDA stated it

8   was quantity "alone" that was misleading. 58 Fed. Reg. 2079 at 2101-2. Moreover, § 101.13(i)(3)

9   is specific to "amount[s] and percentage[s]" that appear on the front label, not the more generic

10  term "protein claim," used in § 101.9(c)(7)(i). When construing these two regulations together, it

11  is clear the FDA intended that protein *quantities*, i.e., "amounts" would, at minimum, *always* be

12  accompanied by information about protein *quality* because otherwise the quantity, by itself, is

13  misleading. On the back, where protein quantity is mandatory, this is spelled out explicitly in

14  § 101.9(c)(7)(1). On the front, where any such statements are entirely voluntary, the FDA does

15  this implicitly via § 101.13(i)(3). This is particularly true given that stating the quantity in grams

16  on the front likely bypasses any need consumers think they may have to look at the back where

17  the %DV is presented.

18       Third, the Ninth Circuit has rejected the notion that a misleading statement on the front

19  can be remedied by disclosures made elsewhere on the packaging. *See Williams v. Gerber Prods.*

20  *Co.*, 552 F. 3d 934, 939-40 (9th Cir. 2008). There, the defendant argued that its front label claims

21  could not be misleading because it disclosed an ingredient list on the packaging. *Id*. The Ninth

22  Circuit "disagree[d]" that "consumers should be expected to look beyond the misleading

23  representations on the front of the box to discover the truth of the ingredient list." *Id*. Though the

24  ingredient list complied with FDA regulations, the Ninth Circuit did "not think that the FDA

25  requires an ingredient list so that manufacturers can mislead consumers and then rely on the

26  ingredient list to correct those misinterpretations and provide a shield for liability for the

27  deception." *Id*. That rationale applies here. Kashi's inclusion of a percent of daily value on the

28

-8-

1    back cannot shield it from liability for its misleading statements on the front of its packaging.[3]

2    **2.   *Section 101.13(o) does not authorize Kashi's front label claim.***

3    Kashi also relies heavily on § 101.13(o) to contend that it requires the same testing

4    methodology for both the front label and the NFP, and that because it uses nitrogen testing to

5    quantify protein inside the NFP, § 101.13(o) authorizes front label claims based on nitrogen

6    testing as well. ECF 21 at 16. But § 101.13(o) does not come anywhere close to saying that.

7    First, by its own terms, § 101.13(o) relates to *compliance*; it does not *authorize* any

8    claims. It states: "*compliance* with requirements for nutrient content claims in this section…will

9    be determined using the analytical methodology prescribed *for determining compliance* with

10   nutrition labeling in § 101.9." (emphasis added). In other words, this provision explains how the

11   FDA will assess compliance for a claim that is *already otherwise authorized* under section

12   101.13. Plaintiffs' claim is that it violates § 101.13(i)(3) in the first instance to have a standalone

13   protein quantity on the front label that fails to account in any way for protein quality because

14   doing so is misleading. The question of compliance for that claim never enters the picture.

15   Second, the language "the analytical methodology [singular] … in § 101.9" does not refer

16   to the multiple testing methodologies (plural) described in section 101.9 to *measure* nutrients;

17   rather, it incorporates by reference *the* analytical methodology for *compliance* in § 101.9, i.e.,

18   101.9(g), which governs sample size, recordkeeping, and the like, none of which is at issue here.

19   Third, Kashi's reading conflicts with § 101.13(c). That provision specifically states that

20   information that is allowed inside the NFP becomes a nutrient content claim—subject to section

21   101.13(i)(3)—when that same information is placed elsewhere on the label. Sections 101.13(c)

22   and (i)(3) would be meaningless if any NFP quantity statement (i.e., "an amount") supported by a

23   § 101.9 testing methodology was automatically permitted.[4]

24   ---

     [3] At minimum, whether the %DV on the back cures what is misleading about the front is a fact

25   question not amenable to resolution on the motion to dismiss. In other words, state and federal
     law agree that protein amounts on the front cannot be misleading so the claim is not preempted. If

26   Kashi has an argument that the claim is not misleading, that goes to the merits, not preemption.
     [4] Indeed, if Kashi's interpretation were true, *Hawkins* and *Reid* would be wrongly decided. There

27   the manufacturers justified their claims with methodologies permitted inside the NFP. *See*
     *Hawkins*, 906 F.3d at 771; *Reid*, 780 F.3d at 963. Under Kashi's theory, the claims could not have

28   been preempted in *Reid* and *Hawkins* due to section 101.13(o). The Ninth Circuit held otherwise
     because they were misleading under section 101.13(i)(3).

Pls.' Opp. to Def.'s Mtn. to Dismiss

1    Fourth, Kashi's reading of § 101.13(o) also does not hold up in light of the framework of

2    the regulations. Section 101.9(c)(7) does not *require* nitrogen testing to quantify protein even

3    inside the NFP, it provides only that nitrogen testing "may" be used. *See* 21 C.F.R. §101.9(c)(7)

4    ("Protein content **may be calculated** on the basis of the factor of 6.25 times the nitrogen content

5    of the food…"). Kashi takes a statement from the Federal Register out of context to argue that it

6    is required. ECF 21 at 15. But, in the exact same document, when asked directly, FDA stated that

7    it "agree[s]…that the term 'may' in § 101.9(c)(7) could be interpreted to mean that *a variety of*

8    *different practices could be used to determine the amount of protein in a serving of food*." *See* 81

9    Fed. Reg. 33742 at 33870 (emphasis added). FDA declined to make nitrogen testing mandatory

10   since "[m]anufacturers are permitted to use other means, such as databases, to determine the

11   amount of protein in…their product." *Id*.  Since FDA permits multiple methodologies to quantify

12   protein, including many not even mentioned in § 101.9, like databases, Kashi's interpretation of

13   § 101.13(o) to mean that nutrient content claims have to be measured according to only those

14   methodologies specifically mentioned in § 101.9 cannot be reconciled with FDA's own position.

15   Finally, even if Kashi's interpretation had any merit, the regulations allow nutrient content

16   claims to be based on PDCAAS since § 101.9 references that methodology. *See* 21 C.F.R.

17   §101.9(c)(7)(ii) ("the 'corrected amount of protein'…is equal to the actual amount of

18   protein…multiplied by the amino acid score corrected for protein digestibility…"). Thus, even

19   under its own interpretation of § 101.13(o), Kashi could provide both a quantity figure based on

20   nitrogen, and a quality figure based on PDCAAS on the front of the package to avoid its

21   standalone quantitative protein amount from being misleading in violation of § 101.13(i)(3).

22   **C.    Kashi's arguments related to Plaintiffs' proposed forms of compliance are wrong**
     **and miss the point.**

23   Though state and federal law mandate the exact same requirement that Plaintiffs' claims

24   seek to enforce here—the requirement that front label claims cannot be "false or misleading in

25   any respect"—Kashi attempts to reframe the claims to sow confusion. Kashi focuses on

26   Plaintiffs' suggested alternative label statements (e.g., stating a PDCAAS figure on its front

27   labels) to argue that because no regulation makes PDCAAS mandatory for the front label,

28   Plaintiffs' claims impose a requirement different from that of the FDA. Kashi also cites two off-

-10-

1    the-cuff emails from unknown employees at FDA as proof that FDA backs its interpretation that

2    PDCAAS is not required for the front label. None of this helps Kashi for several reasons, the most

3    important of which is that Plaintiffs claims do not depend on or require *any alternative statement*.

4                        **1.  *Plaintiffs' proposed forms of compliance do not impose additional
                               requirements; Kashi still remains liable for its misleading claims.***

5            Kashi's attempt to reframe Plaintiffs' claims in terms of what Kashi could alternatively

6    say on its front label is wrong. Federal preemption law recognizes a difference between the

7    "requirements" of FDA regulations, and the "remedies" available under state law. *See Bates v.*

8    *DowAgrosciences LLC*, 544 U.S. 431 (2005). Preemption provisions exempting identical

9    "requirements" do "not preclude States from imposing different or additional *remedies*." *Id*. at

10   448. Here, Plaintiffs' claim is not that Kashi *must* state anything at all about protein on the front

11   label, only that whatever it says cannot be misleading. The "requirement" to avoid stating a

12   protein amount that is misleading in any respect is identical between federal and state law, thus

13   the claim, and Kashi's underlying liability, are not preempted. Whatever Kashi could say

14   alternatively on the front to avoid being misleading is a question about the *remedies* available in

15   this case, in particular the scope of injunctive relief, not *liability*. At a minimum, state and federal

16   law agree that Kashi cannot make the current form of its statement, so it has to come off.

17           This interpretation aligns with the framework of the regulations. The Court in *Porter II*

18   explained that suggested alternative protein claims "represent[] [some] of many advertising

19   solutions, not new or different requirements concerning the composition or labeling of food."

20   *Porter II*, 2019 U.S. Dist. LEXIS 190495, at *9-10. FDA and its regulations "do not specify every

21   way protein content or source can be calculated or advertised outside the nutrition panel." *Id*.

22   "Instead, there is a uniform federal requirement prohibiting false or misleading food labels". *Id*.

23   While the regulatory regime leaves open how to avoid being misleading, there is no question that

24   misleading labels are always prohibited due to sections 101.13(i)(3) and 101.13(b). If Kashi's

25   front label protein quantity claims are misleading, then, at minimum, Kashi *must* remove the

26   claim as it exists now. After all, as the Ninth Circuit recognizes, "the general rule is that 'nutrient

27   content claims' are ***not permitted on food labels***." *Reid*, 780 F.3d at 959 (emphasis added).

28           Regardless, even accepting the concept that applying PDCAAS to the front label imposes

-11-

1   a "requirement," Kashi's argument fails because: (1) Plaintiffs' claims do not depend on Kashi

2   having to make such a statement, but (2) doing so would still be entirely consistent with FDA

3   regulations. Both *Porter I* and *Ulrich* held that "it would not violate federal regulations" to use

4   PDCAAS for the front label even though it is permissible to use nitrogen testing for the NFP.

5   *Porter I*, 2016 U.S. Dist. LEXIS 163352 at. *16*; see also Ulrich*, 2017 U.S. Dist. LEXIS 132202,

6   at *11-12 ("[T]o the extent that plaintiff claims that Probalance violates state law…because they

7   do not calculate the protein content according to the PDCAAS-adjusted method, plaintiff is not

8   asserting that Probalance violated any state-law requirements different from or additional to the

9   requirements of the FDCA and its implementing regulations.") Any inconsistencies that may

10  result is irrelevant because, as *Porter II* explained, "[t]he regulations already allow for certain

11  inconsistencies in statements of protein content" and using PDCAAS is an option for compliance

12  with § 101.13(i)(3). *Porter II*, 2019 U.S. Dist. LEXIS 190495, at *9-10.

13                              **2.   *Kashi's emails are not entitled to any deference.***

14         Kashi relies on two emails from inquiries submitted to FDA to claim FDA agrees with its

15  interpretation.[5] The Court need not engage in this analysis since it cannot defer to the emails.

16         In *Kisor*, the Supreme Court admonished lower courts for doing exactly what Kashi is

17  asking the Court to do here, which is abdicate its responsibility to interpret regulations in favor of

18  *ad hoc* statements from unknown, unvetted agency employees. *Kisor v. Wilkie*, 139 S. Ct. 2400

19  (2019). Under *Kisor*, deference never enters the picture unless, after deploying all the

20  interpretative methods in the "legal toolkit," the court finds that the regulations at issue are

21  "genuinely ambiguous," and then only if the proffered interpretation is reasonable, and represents

22  the *official* position *of the agency*. *Id*. at 2405-06. Unless all of these are satisfied, the Court

23  cannot give the proffered interpretation *any* weight. Here, none are.

24  ─────────────────

25  [5] There Court should decline to take judicial notice of the two emails (Exs. 4 and 5 to ECF No.
    22). The emails are not a matter of public record, and, therefore, do not come from sources whose
26  accuracy cannot be reasonably questioned. *See, e.g., Barron v. Snyder's-Lance, Inc.*, 2015 U.S.
    Dist. LEXIS 189625, *17-18 (11th Cir. 2015) (noting that "[j]udicial notice appears to hinge on
27  whether the reports or records are publicly available"). Kashi argues that judicial notice is
    appropriate because they "reflect [CFSAN's] views as to the appropriate interpretation of 21
28  C.F.R. § 101.9(c)(7)." But that is an issue of disputed fact inappropriate for judicial notice. *See
    Lee v. City of Los Angeles*, 2001 U.S. App. LEXIS 8150, *40-41 (9th Cir. 2001).

Pls.' Opp. to Def.'s Mtn. to Dismiss

1    The regulations here are not "genuinely ambiguous." As *Kisor* explains, "Courts retain a

2   firm grip on the interpretive function"; only after "a court bring[s] all its interpretive tools to

3   bear" can a regulation be "genuinely ambiguous." *Id*. at 2421, 2423. "[A] court cannot wave the

4   ambiguity flag just because it found the regulation impenetrable on first read." *Id.* at 2415.

5   "[H]ard interpretive conundrums, even relating to complex rules, can often be solved." *Id.* And in

6   that vein, *Kisor* mandates that courts must exhaust all the "traditional tools" of construction,

7   including examining the regulation's "text, structure, history, and purpose" before giving up. *Id.*

8   at 2415. Only when the "legal toolkit is empty" and "the regulation remains genuinely susceptible

9   to multiple *reasonable* meanings" can a court even begin to consider a proffered agency

10   interpretation. *Id*. at 2415, 2419 (emphasis added). That situation is very rare. *Id.*

11    Here, Plaintiffs base their claims on sections 101.13(b), (c) and (i)(3) – the same

12   regulations the Ninth Circuit interpreted in *Hawkins* and *Reid* without any findings of ambiguity.

13   *See Hawkins*, 906 F.3d at 770-73; *Reid*, 780 F.3d at 959-60. Section 101.13(c) makes clear that

14   taking "11g protein" from the NFP and stating it elsewhere in the package is a nutrient content

15   claim. Section 101.13(b) further provides that nutrient content claims "may not be made on the

16   label" unless they comply with section 101.13; and section 101.13(i)(3), in turn, bans misleading

17   statements about the "amount" of a nutrient. When taken together, the regulations unequivocally

18   do not allow manufacturers to state misleading amounts of a nutrient, like protein, on the front of

19   the label, even if permitted inside the NFP. That ends the analysis. The emails' proffered

20   interpretations are also not reasonable. They do not consider the most important regulations at

21   issue here (i.e. §§ 101.13(b), (c), & (i)(3)) and they conflict with FDA regulations and official

22   guidance. *See supra* Section B(1).

23    The emails also do not come close to representing an official agency policy. They lack the

24   classic hallmarks – they are not the product of a collective, formal process set by FDA, nor are

25   they publicly available or included in the federal register. *Compare Bassiri v. Xerox Corp*., 463

26   F.3d 927, 933 (9th Cir. 2006) (DOL opinion letters were publicly available and entitled to *Auer*

27   deference"). Indeed, the only reason Plaintiffs and the Court know about the emails is because

28   they were produced in litigation. It would be strange, to say the least, to allow an agency to set

Pls.' Opp. to Def.'s Mtn. to Dismiss

1   "official" policy by communicating that policy to a few outside lawyers upon request but not

2   disclose it to those whom the agency regulates. *See e.g., Kisor*, 139 S. Ct. at 2417-18.

3          If there were any doubt, FDA regulations themselves make clear that "[a]n advisory

4   opinion represents the formal position of FDA on a matter" but "[a] statement or advice given by

5   an FDA employee orally, or given in writing but not under this section or §10.90, ***is an informal***

6   ***communication*** that represents the best judgment of that ***employee*** at that time" and "***does not***

7   ***necessarily represent the formal position of FDA.***" 21 C.F.R. § 10.85(k) (emphasis added). The

8   emails simply cannot carry the force of law since they are not official advisory opinions.

9          Given the glaring deficiencies with the emails, Kashi asks the Court to apply *Skidmore*

10  deference as a fallback position. But *Skidmore* deference doesn't get Kashi anywhere. As Justice

11  Kavanaugh put it during oral argument in *Kisor*, "*Skidmore* deference is – is really no deference

12  because it – it applies only when it's persuasive, which is true of any argument." *See* Oral Arg.

13  Tr. at 15:24-16:2 (https://www.supremecourt.gov/oral_arguments/argument_transcripts/2018/18-

14  15_8nj9.pdf.); *see also Hall v. United States Dep't of Agric.*, 984 F.3d 825, 837 (9th Cir. 2020)

15  (*Skidmore* deference is available only to the extent it has the "power to persuade"). It is hard to

16  see why off-the-cuff statements from unknown agency employees – made without any analysis or

17  consideration of even the primary regulation at stake in this case – should carry any weight,

18  especially when the upshot would be to displace broad swaths of state law. Kashi does not offer

19  any cogent reason. The Court should decline to afford the emails *any* deference. *See Hardeman v.*

20  *Monsanto Co.*, 997 F.3d 941, 957 (9th Cir. 2021) (holding that an informal letter from EPA "did

21  not follow any 'formal administrative procedure' that would give the letter the force of law.")

22          **D.      Kashi's remaining arguments are without merit.**

23          Throughout its brief, Kashi contends that "[h]ad FDA intended to require manufacturers to

24  place different protein measurements on the front of the package and in the Nutrition Facts panel,

25  it could have—and would have—said so explicitly." ECF 21 at 17. As an initial matter, as

26  explained above, Plaintiffs' claims do not depend on any alternative statement on the front so this

27  argument is a red herring. Regardless, the Ninth Circuit rejected this argument in *Astiana v. Hain*

28  *Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015). There, the defendant argued that "FDA's

-14-

1    failure to issue specific regulations on the subject is tantamount to a conscious decision by the

2    agency to permit any [methodology] a manufacturer sees fit." *Id.* at 758. The Ninth Circuit held

3    that "[b]y this logic, a manufacturer could make any claim—wild, untruthful, or otherwise—

4    about a product whose contents are not addressed by a specific regulation." *Id*. Instead, the statute

5    "proscribes statements that are 'false or misleading in any particular,' not statements that are

6    'prohibited by specific FDA regulations.'" *Id*. So too here. If Kashi's claims are misleading, then,

7    at a minimum, they have to come off because section 101.13(b) does not allow products to make

8    nutrient content claims that fail to comply with section 101.13, including section 101.13(i)(3).

9         Kashi also contends that Plaintiffs' claims impose additional requirements because "the

10   FDA regulations do not require Kashi to use 'amino acid content testing' to calculate the amount

11   of protein in its products." ECF 21 at 13. Kashi misunderstands the purpose of the amino acid

12   testing referenced in the Complaint. Its purpose is not say that Kashi must base its front label

13   claims on amino acid testing. Its purpose, instead, is to establish that Kashi's front label protein

14   claims are not only misleading, but also literally false—its products actually contain far less

15   protein than represented, so they cannot make the claim.

16       **E.**      **The primary jurisdiction doctrine does not apply.**

17         In a last ditch effort, Kashi devotes about one sentence – without any analysis whatsoever

18   – to invoke the primary jurisdiction doctrine and ask the Court stay the case "until FDA provides

19   more authoritative guidance." ECF 21 at 21. The doctrine applies only in "limited

20   circumstances." *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114 (9th Cir. 2008). Kashi does

21   not offer any justification for why either of those circumstances apply here, nor can it wait to

22   raise those arguments in its reply brief.[6] The Court can ignore this argument.

23

24

25

26   [6] There are no justifying circumstances here. There is nothing novel about the issues at stake.
     Numerous courts have addressed similar claims, and there is no indication the FDA is taking any

27   imminent rulemaking or adjudicatory action on any issue in this case. Finally, "every day courts
     decide whether conduct is misleading"—an issue "within the expertise of the courts to resolve."

28   *Jones v. ConAgra Foods, Inc*., 912 F. Supp. 2d 889, 899 (N.D. Cal. 2012); *see also Bruton v.
     Gerber Products Co*., 961 F. Supp. 2d 1062, 1084-85 (N.D. Cal. 2013).

Pls.' Opp. to Def.'s Mtn. to Dismiss

1    Dated: November 19, 2021

2                                                                **GUTRIDE SAFIER LLP**

3                                                                */s/ Seth Safier*
                                                                 Seth A. Safier, Esq.
4                                                                Marie McCrary, Esq.
                                                                 Hayley Reynolds, Esq.
5                                                                100 Pine Street, Suite 1250
                                                                 San Francisco, CA 94111

6
                                                                 Kali R. Backer, Esq.
7                                                                4450 Arapahoe Ave., Suite 100
                                                                 Boulder, CO 80303

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pls.' Opp. to Def.'s Mtn. to Dismiss